[No. A032118. First Dist., Div. Two. Dec. 16, 1986.]

CITY OF ANTIOCH, Plaintiff and Appellant, v.
CITY COUNCIL OF THE CITY OF PITTSBURG,
Defendant and Respondent;
A. D. SEENO CONSTRUCTION COMPANY,
Real Party in Interest and Respondent.

**COUNSEL**

William R. Galstan, City Attorney, for Plaintiff and Appellant.

Charles J. Williams and Williams, Caploe & Robbins for Defendant and Respondent.

Robert J. Rossi for Real Party in Interest and Respondent.

**OPINION**

**KLINE, P. J.—**

### INTRODUCTION

The City of Antioch appeals from a judgment of the Contra Costa County Superior Court denying Antioch's petition for a writ of mandate to compel the Pittsburg City Council (City Council) to set aside its negative declaration and prepare an environmental impact report (EIR) for a proposed road and sewer construction project. Antioch contends that Pittsburg violated the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA) when it approved construction of a roadway and appurtenant utilities on the basis of the negative declaration rather than an EIR. Antioch also contends that the project is inconsistent with Pittsburg's general plan and is therefore invalid.

### STATEMENT OF THE CASE/FACTS

Real party in interest A.D. Seeno Construction Company (Seeno), the project developer, sought a site development permit from Pittsburg and the initiation of an assessment district for the construction of a roadway and

appurtenances on three parcels of land owned by it and located west of Somersville Road, north of Highway 4 in Pittsburg. The property is commonly known as the "Baker" property.[1] The project consisted of "1. Construction of 'A' Boulevard which will be 6,400' with an eighty-four (84) foot right-of-way and sixty-four (64) foot curb separation. 2. Widening of the west side of Somersville Road along property frontage. 3. Construction of sanitary sewer system and pump station. 4. Construction of a culvert at the [U.S. Bureau of Reclamation] open channel. 5. Construction of underground storm drain system. 6. Construction of an underground water distribution system. 7. Construction of underground utility lines."

On July 16, 1984, Pittsburg prepared an initial study checklist regarding the project. The checklist concluded that "although the proposed project could have a significant effect on the environment, there will not be a significant effect in this case because the mitigation measures described on an attached sheet have been added to the project. A NEGATIVE DECLARATION will be prepared." Attached was a one-and-one-half-page explanation as to why impacts identified in the checklist were not considered significant.

Upon the basis of the initial study checklist, Pittsburg, acting through its community development director, found that the proposed roadway was consistent with the circulation element of the general plan and that the project would not have a significant effect on the environment. The director therefore determined to issue a negative declaration. During the public review period for the negative declaration, Antioch appealed to the Pittsburg City Council.

Following a public hearing on the appeal, the City Council upheld the decision to prepare a negative declaration. The City Council found, in pertinent part, that "The project does not involve the connection of the proposed street to any other existing street. The project does not involve the construction of buildings or the introduction of any land uses that do not presently exist. The alteration of land for other than the purposes of the project and the introduction of any land use other than that now existing on the parcels described are not covered by the negative declaration proposed in this proceeding and will be the subject of separate land use and other discretionary entitlements which will be the subject of the environmental review process and separate findings as to the existence or non-existence of significant effects on the environment . . . ." The City Council also found that "there was no apparent serious public controversy concerning the project and no disagreement between experts over the significance of the effect of

---

[1] The Baker property is adjacent to Antioch's western boundary, and abuts Somersville Road which appellants describe as "a major arterial for Antioch, which is a high-volume arterial serving Antioch's commercial centers, proposed industrial uses, and makes a connection to downtown Antioch." A portion of Somersville Road represents the boundary line between the two cities.

the project on the environment. The only comment received was from the BART District relating to the possible location in the vicinity of the project of a transit station. It did not concern environmental effects of the project." The City Council concluded that "Based upon the foregoing findings there is no substantial evidence that the project will have a significant effect on the environment."

On December 26, 1984, Antioch filed a petition for writ of mandate. On June 3, 1985, the superior court denied the writ, following a hearing. In a memorandum of decision, the court explained:

"I. The writ is denied. It must be found that the road is in a very large completely undeveloped area so that, if an EIR is required because of possible future development almost an infinite number of potential developments must be considered. Obviously this is an impossible task. The developer says also that until the road location is fixed it can't plan future development because future purchasers-lessees could not commit themselves. The Court is impressed with Pittsburg's arguments to this effect. [¶] *S.F. For Reasonable Growth v. S.F.* [(1984) 151 Cal.App.3d 61 (198 Cal.Rptr. 634)] is distinguishable. It required, in an EIR report, that the county consider probable future development. *Whitman* v. *Board* [(1979) 88 Cal.App.3d 397 (151 Cal.Rptr. 866)] is also a writ taken from approval of an EIR report. Neither case involved a writ taken from a negative declaration. [¶] Obviously when you are doing an EIR you must take into consideration cumulative future impacts. When you do a negative declaration knowing that when actual development plans are presented an EIR will be done, future impact consideration is unnecessary. [¶] II. The evidence does not support the contention that the project is inconsistent with the General Plan."

A timely notice of appeal followed.

DISCUSSION

In our recent opinion in *City of Livermore* v. *Local Agency Formation Com.* (1986) 184 Cal.App.3d 531 [230 Cal.Rptr. 867], we reiterated the principles guiding review under CEQA of an agency's decision to issue a negative declaration. As we stated, "CEQA establishes the administrative procedure of an environmental impact report. ■ So that the environmental effect of every public agency action is assessed and evaluated (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74–75 . . .), EIRs must be prepared for all 'projects' that 'may have a significant effect on the environment.' (Pub. Resources Code, § 21151.) [¶] . . . [¶] The language of CEQA and its guidelines includes all discretionary projects that have a direct or ultimate impact on the environment. [¶] In interpreting the language we are guided by our Supreme Court's statement in *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 . . ., that 'the

Legislature intended [CEQA] to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' (See also *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 277-279 . . . .)" (184 Cal.App.3d at pp. 537-538.)

In determining that the impact of the project was significant enough to require preparation of an EIR in the *City of Livermore* case, we adhered to the standard of review set out in Public Resources Code section 21168 and applied in *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 1002 [165 Cal.Rptr. 514], *Newberry Springs Water Assn.* v. *County of San Bernardino* (1984) 150 Cal.App.3d 740, 748 [198 Cal.Rptr. 100], and *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 172-173 [217 Cal.Rptr. 893]. ■ As we stated, "[i]f 'it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact,' the agency must prepare an EIR. (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 74-75; see also Cal. Admin. Code, tit. 14, § 15064(g)(1).) [¶] Deciding whether a fair argument can be made requires the agency to weigh the evidence on both sides of the question. If there is substantial evidence of a significant environmental impact, evidence to the contrary does not dispense with the need for an EIR when it still can be 'fairly argued' that the project may have a significant impact. (*Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 102 [165 Cal.Rptr. 514].) [¶] Our standard of review of the agency's decision is set out in Public Resources Code section 21168: '. . . the court shall only determine whether the act or decision is supported by substantial evidence in light of the whole record.' (See also Code Civ. Proc., § 1094.5.) . . . . [¶] The 'act or decision' we review here is not the decision that the project may or may not have a significant environmental impact, but the decision that it can or cannot be *fairly argued* that the project may have a significant environmental impact. Because our focus is on the fair argument decision, we must assess both the evidence in favor of the significant environmental impact and the evidence to the contrary—only then can we properly decide if the agency's conclusion regarding the fair argument question is supported by substantial evidence in light of the whole record." (*City of Livermore, supra,* at pp. 540-541, italics in original, fn. omitted.)

Respondents argue that the consequences of the instant project do not fall within the examples of significant effects contained in the regulation guidelines (appen. G to tit. 14, Cal. Admin. Code, § 15064, subd. (e)); that the project does not involve the connection of a road to any other proposed or existing street (and therefore does not create or complete a circulation pattern); that no buildings or new land uses are included in the project and that any land use other than that now existing and any construction other than that described in the project will be the subject of further environmental

review; that no substantial body of opinion considers the effect of the project adverse; and that generally the project is consistent with the existing general plan.

██ Initially, we point out that conformity with the general plan for the area, if such is the case, does not insulate a project from the EIR requirement, where it may be fairly argued that the project will generate significant environmental effects. The initial study checklist and the determination of the community development director to issue the negative declaration relied heavily upon the project's asserted conformity with the general plan.[2]

Government Code section 65402 mandates that a public works project such as the roadway and utilities contemplated here must be consistent with the city's general plan. However, there is no indication in CEQA that mere conformity with the general plan will justify a finding that the project has no significant environmental effect. Certainly general plan conformity alone does not effectively "mitigate" significant environmental impacts of a project.

██ Further, the City Council's finding that there was "no apparent serious public controversy concerning the project," if deemed true, would not of itself support the decision to issue a negative declaration. (Cf. *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra,* 175 Cal.App.3d 151, 173.) The Guidelines provide that "[i]n marginal cases where it is not clear whether there is substantial evidence that a project may have a significant effect on the environment, the lead agency shall be guided by the following factors: [¶] (1) If there is serious public controversy over the environmental effects of a project, the lead agency shall consider the effect or effects subject to the controversy to be significant and shall prepare an EIR. Controversy unrelated to an environmental issue does not require preparation of an EIR." (Admin. Code, tit. 14, § 15064, subd. (h)(1); Pub. Resources Code, § 21082.2.) Only if the case were truly "marginal" would

---

[2]The initial study checklist prepared by the planning division listed in mitigation of possible impacts on road maintenance and certain substantial impacts upon utilities the following: "Construction of roadway and infrastructure for basic utility support systems will be added to City systems in the future. This is not considered significant as plans are in conformance with City's Master Plans." Responding to the finding that the project has impacts which are individually limited, but cumulatively considerable, the checklist mitigation measure stated: "*The construction of the roadway will have a cumulative impact of opening the way for future development. This is not considered significant as it is in compliance with the General Plan.* Environmental review of all future proposals for the property will occur prior to the approval of development plans." (Italics added.)

The finding of no significant impact, made by the community development director was accompanied by the following statement of reasons: "3. Statement of Reasons to Support the Finding (Mitigation Measures) [¶] A. General Plan/Land Use Comparability: The project is consistent with the Circulation Element of the General Plan. [¶] . . . [¶] D. Utility Impacts: The project will extend all utility networks through the site. This is not considered significant as this has been addressed in the City's Master Plans. Connections to systems in other jurisdictions will be subject to their approval."

the public controversy factor be significant. In short, if it may be fairly argued that the impacts are significant, the absence of public controversy will not justify the decision to issue a negative declaration.

The heart of respondents' argument that a negative declaration is appropriate here is the fact that the proposed roadway will not at this stage connect with an existing street and thus will generate no traffic or impacts upon circulation and that the utilities also will remain unconnected. Respondents also argue that the proposals for future development will be subject to further environmental review at the time of development of the surrounding land.

Respondents reason that the project involves no building construction or introduction of new land uses and that at present it is not known what type of development will occur on the surrounding undeveloped land. Thus, as the trial court found, any EIR must consider "almost an infinite number of potential developments." The trial court focused primarily upon the difficulties of preparing a meaningful EIR in view of the myriad possibilities for future development of the surrounding land, rather than upon the cumulative effect of the road and utility construction as the opening wedge in the ultimate development of the Baker property.

■■■ Under CEQA, the agency must consider the cumulative environmental effects of its action before a project gains irreversible momentum. (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 282 [118 Cal.Rptr. 249, 529 P.2d 1017]; *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 242 [227 Cal.Rptr. 899].) As the California Supreme Court stated in *Bozung* v. *Local Agency Formation Com.*, *supra*, 13 Cal.3d 263, 282: "CEQA . . . requires governmental agencies 'at all levels' to consider environmental factors. Obviously it is desirable that the precise information concerning environmental consequences which an EIR affords be furnished and considered at the earliest possible stage. The Guidelines express this principle in a variety of ways. Thus, 'EIR's should be prepared as early in the planning process as possible to enable environmental considerations to influence project, program or design.' (Cal. Admin. Code, tit. 14, § 15013.)" (See also *City of Carmel-by-the-Sea*, *supra*.)

The requirement of early preparation of an EIR is designed to avoid the type of piecemeal review in which "environmental considerations . . . become submerged by chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences." (*Bozung, supra*, at pp. 283-284; *Carmel-by-the-Sea, supra*, at p. 244.) Here, appellant rightly fears the type of piecemeal review which occurred in *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra*, 172 Cal.App.3d 151 (hereafter referred to as *County of Inyo*). In that case the county approved a general

plan amendment and zoning classification on the basis of a negative declaration. As described by the court in *City of Carmel-by-the-Sea, supra*, "The rationale behind the decision was similar to that advanced by the agency in *Bozung* and rejected by the Supreme Court, namely that preparing an EIR would be premature at the zoning stage since the tentative map for the project, a shopping center, was not before the agency. In *County of Inyo*, when the tentative map was in fact before the Board it was again recommended that no EIR was needed since the proposed use now conformed to the existing zoning. The court of appeal, citing *Bozung*, found that this approach—division of the project into two parts with 'mutually exclusive' environmental documents—was 'inconsistent with the mandate of CEQA' and constituted an abuse of discretion. (*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo, supra*, 172 Cal.App.3d at p. 167.) [¶] *County of Inyo* cites section 15378, subdivisions (c) and (d) . . . interpreting these sections to mean that an agency cannot term each stage of the development 'a project' with no significant impact and thereby issue a series of negative declarations when the project as a whole would have required an EIR. In other words, where the project is a development, for which various governmental approvals are necessary, '[a]ll phases of project planning, implementation, and operation must be considered in the initial study of the project' (Guidelines, § 15063, subd. (a)(1)), and an EIR must address all phases." (*City of Carmel-by-the-Sea, supra*, 183 Cal.App.3d at pp. 242-243.)

Respondents, like the responsible agencies in *Bozung, County of Inyo* and *City of Carmel-by-the-Sea*, urge us to look at the proposed project in a vacuum, arguing that EIR preparation is premature and assuring us that other phases of development of the entire property will be accorded appropriate environmental review in due course. With the courts in the three cases just cited, we must reject this approach.

The planning department study itself recognized that "construction of the roadway will have a cumulative impact of opening the way for future development." The location and design of the road and appurtenant sewage and water distribution facilities will strongly influence the type of development possible.

The adverse effects and substantial impacts appellant believes may result from construction of the roadway and related utilities are set forth in the margin below.[3] Respondents do not so much dispute these possible effects

---

[3]Antioch's administrative appeal specified several adverse environmental impacts which may occur as a result of the project. For example, the traffic impact on Highway 4 and Somersville Road was expected to be severe, with the freeway interchange expected to operate at "level F" in the future. The appeal identified off-street improvements and highway improvements, safety hazards and train traffic problems, and impact of a future BART station on the site. The appeal also noted concerns with noise, impacts on utilities, and air quality

as insist that appellant's concern is premature, because the project will not now be connected to existing roads and utilities.

It must be acknowledged that it is at this stage impossible to specify the precise development that will eventually occur or the actual uses to which the property will be put. This uncertainty makes it difficult to assess the actual usage of the roadway and utilities and their impact on the environment. Respondents rely on these uncertainties in contending that an EIR at this stage would "'. . . tend toward uninformative generalities'" (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 77, fn. 5 [118 Cal.Rptr. 34, 529 P.2d 66] quoting from *Scientists' Inst. for Pub. Info., Inc.* v. *Atomic Energy Com'n* (1973) 156 App.D.C. 395 [481 F.2d 1079, 1093].) Respondents' argument that we should consider the road and related utilities in isolation, unconnected to any existing or future transportation systems or development is based upon *Brentwood Assn. for No Drilling, Inc.* v. *City of Los Angeles* (1982) 134 Cal.App.3d 491 [184 Cal.Rptr. 664]. In *Brentwood,* the Court of Appeal upheld the decision of the trial court requiring an EIR for exploratory drilling of a single core hole. However, in so doing, the appellate court reviewed "the decision of the city council to grant [the driller] a conditional use permit on the basis of a negative declaration rather than requiring preparation of an environmental impact report . . . from the perspective of the potential impact on the environment of exploratory drilling rather than full scale production." (*Id.,* at p. 502.) Evidence before the trial court showed that 55 percent of core holes were successful and approved. "Thus, little more than one-half of all core hole projects culminate in approved applications for commercial drilling." (*Id.,* at p. 502.) For this reason, the Court of Appeal declined to treat exploratory drilling as the equivalent of commercial production.

The facts of *Brentwood* are not analogous to those we confront here: The location of the Baker property, as well as the desire of the City of Pittsburg to facilitate its development, render it virtually certain that additional development will result. The size, location and configuration of the roadway and utilities will influence not only the fact but the nature of later development to a much greater degree than the single test hole at issue in *Brentwood.*[4]

---

impacts. A number of technical engineering concerns were also addressed. These included, among others, possible downstream drainage problems and the fact that Antioch, Pittsburg and Delta Diablo Sanitation District "are discussing sewer service that should provide this property and other properties south with a gravity sewer system rather than the lift station system proposed."

[4]This case is also distinguishable from *Plan for Arcadia, Inc.* v. *City Council of Arcadia* (1974) 42 Cal.App.3d 712 [117 Cal.Rptr. 96] and *Newberry Springs Water Assn.* v. *County of San Bernardino, supra,* 150 Cal.App.3d 740, cited by respondents and approving the issuance of negative declarations. *Plan for Arcadia, Inc.* involved widening of a street. The Court of Appeal upheld the city's negative declaration concluding that substantial evidence supported the city's action where a detailed showing was made of the number of trees and

Construction of the roadway and utilities cannot be considered in isolation from the development it presages. Although the environmental impacts of future development cannot be presently predicted, it is very likely these impacts will be substantial. As we stated in *City of Livermore, supra,* 184 Cal.App.3d 531, in the related context of determining whether a Local Agency Formation Commission's (LAFCO) sphere-of-influence guideline revisions fit within CEQA's broad definition of a "project": "It is true that the precise effects [of the revisions] are difficult to assess at this stage, but it is because impact is so easily foreseen that the revisions must be considered a project under CEQA." (*Id.,* at p. 538.)

*Bozung, Livermore* and *City of Carmel-by-the-Sea* all concerned projects which did not directly involve construction of structures or actual development.[5] *Bozung* required an EIR prior to LAFCO approval of annexation to a city of 677 acres of agricultural land "proposed to be used for 'residential, commercial, and recreational' purposes." (13 Cal.3d at p. 281.) As earlier indicated, *Livermore* held that the Alameda County LAFCO must prepare an EIR prior to implementing its sphere of influence guideline. *City of Carmel-by-the-Sea* required an EIR prior to rezoning. None of these cases hesitated to require an EIR where significant impacts were a realistic possibility, even though the exact form that development would take could not be known.

■ The EIR is designed to provide comprehensive environmental analysis of the impacts of many different types of projects and at differing stages of development. EIR requirements must be sufficiently flexible to encompass these vastly differing projects with varying levels of specificity. The need for such flexibility was discussed in *City of Carmel-by-the-Sea.* There it was argued that "[a]n EIR at the zoning stage would not be feasible. Environmental impacts would be too speculative and mitigation measures could not be given meaningful consideration." (183 Cal.App.3d 229, 249.) The court rejected this position as contrary to "a mass of authority following

---

other plantings that would be affected as well as to the replacement landscape that would take place, and where comment was made as to air quality and noise impacts. (*Id.,* at p. 725.) *Newberry Springs Water Assn.* upheld the city's issuance of a negative declaration for a dairy, concluding that plaintiffs presented insufficient evidence to show that a fair argument for substantial environmental impact could be made. As stated by the court, "There is no real evidence in the record, other than plaintiffs' opinion, that odors or flies will cause substantial adverse effects on the physical conditions in the area . . . ." (*Id.,* at p. 749.) The construction of more than a mile of "boulevard," together with sewer lines and utilities is far more likely to generate substantial impacts than the street widening in *Plan for Arcadia.* Further, the challenge raised by Antioch is supported by more than opinion evidence. The Antioch Director of Public Works raised serious questions about the project in his letter to the developer, as did the Assistant City Manager. The initial study itself recognized that the project had substantial cumulative impacts in that it was the first step in marketing and developing the Baker property.

[5]*County of Inyo* required preparation of an EIR for county actions approving general plan amendments, zoning reclassification, tentative tract map and road abandonment in connection with a proposed shopping center.

*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263." *(Id.,* at pp. 249-250, fn. omitted.) "The fact that the environmental consequences of a rezoning may be more amorphous than those flowing from a precise development plan does not compel the conclusion that no EIR is required. The CEQA guidelines recognize that an EIR for zoning purposes will necessarily be less detailed than one prepared for a specific construction project. Guidelines section 15146, subdivision (b) provides that '[a]n EIR on a project such as the adoption or amendment of a comprehensive zoning ordinance . . . should focus on the secondary effects that can be expected to follow from the adoption . . . but the EIR need not be as detailed as an EIR on the specific construction projects that might follow.' In addition, Guideline section 15152 endorses 'tiering' EIRs so that later EIRs at subsequent phases of a project need not repeat material contained in earlier documents. ▮ Thus the difficulty of assessing future impacts of a zoning ordinance does not excuse preparation of an EIR; such difficulty only reduces the level of specificity required and shifts the focus to the secondary effects." *(Id.,* at p. 250.) We do not believe that the EIR required in this case must describe in detail each and every conceivable development scenario. All it must analyze are the road and utility impacts in relation to the most probable development patterns.

▮ Relying upon section 15064, subdivision (e), of the Guidelines and Appendix G thereto, which indicate that extension of a sewer line with capacity to serve a new development will normally be deemed to have a significant effect on the environment,[6] appellant also claims that construction of the utilities requires an EIR. Making a distinction we think altogether unjustifiable, respondent answers that the Guidelines "refer[] specifically to extending a sewer trunk line and not to creating a new sewer system." If extension of an existing sewer trunk line will ordinarily have a significant environmental impact, a fortiori construction of a new line and pump station will do so. It ignores reality to contend that a sewer system has no significant impact on the environment because it will not be connected until some future date. As with construction of the roadway, it is important to consider prior to construction issues of location, capacity, type of system and its impact.

▮ In sum, our decision in this case arises out of the realization that the sole reason to construct the road and sewer project is to provide a catalyst for further development in the immediate area. Because construction of the project could not easily be undone, and because achievement of its purpose would almost certainly have significant environmental impacts, construction should not be permitted to commence until such impacts are evaluated in

---

[6]Administrative Code, title 14, section 15064, subdivision (e), provides in pertinent part: "Some examples of consequences which may be deemed to be a significant effect on the environment are contained in Appendix G." Appendix G provides in relevant part: "A project will normally have a significant effect on the environment if it will: [¶] (s) Extend a sewer trunk line with capacity to serve new development . . . ."

the manner prescribed by CEQA. As Justice Rouse explained in our opinion *San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61 [198 Cal.Rptr. 634], the fact that a particular development which now appears reasonably foreseeable may, in fact, never occur does not release it from the EIR process. (*Id.*, at p. 75.) Similarly, the fact that future development may take several forms does not excuse environmental review.

 In the circumstances of this case, as we have said, it is necessary to evaluate only the forms and extent of future development that now reasonably seem most likely to result from the roadway and utility projects. While Pittsburg cannot be expected to know the exact level of use of the roadway at such time as it is connected to existing highways, it must assume a level of use at that time that now seems probable. Similarly, while Pittsburg need not predict the precise form, location and amount of commercial and residential development resulting from construction of the roadway and utilities, it cannot pretend none will occur; it simply must assume the *general* form, location and amount of such development that now seems reasonable to anticipate, as the developer has doubtless already done, and evaluate that development by means of the EIR process.

For the foregoing reasons, we conclude that substantial evidence does not support issuance of the negative declaration as it appears that construction of the roadway and accompanying utilities may have a significant impact on the environment. The negative declaration must therefore be set aside and the City of Pittsburg ordered to prepare an EIR.[7]

The judgment is reversed with directions to the superior court to issue a peremptory writ of mandate directing respondent City Council to set aside its order adopting the negative declaration and to prepare an EIR for the project.

Each party to bear its own costs on appeal.

Rouse, J., and Benson, J., concurred.

---

[7]We need not, therefore, address further appellant's contention that the claimed inconsistency between the project and the general plan renders the project unlawful.