23 Cal.Rptr.3d 60 (2005)
125 Cal.App.4th 644
MUZZY RANCH CO., Petitioner and Appellant,
v.
SOLANO COUNTY AIRPORT LAND USE COMMISSION, Defendant and Respondent.
No. A104955.
Court of Appeal, First District, Division 5.
January 5, 2005.
As Modified on Denial of Rehearing February 4, 2005.
Review Granted April 13, 2005.
*61 Howard Rice Nemerovski Canady Falk & Rabkin, Richard C. Jacobs and Jonathan W. Hughes, San Francisco, for petitioner and appellant.
Dennis Bunting, County Counsel and James Laughlin, Deputy County Counsel, for defendant and respondent.
Certified for Partial Publication.[*]
GEMELLO, J.
In this case we determine whether respondent Solano County Airport Land Use Commission's adoption of an airport land use compatibility plan for the area surrounding the Travis Air Force Base was a "project" as that term is used in the California Environmental Quality Act (CEQA). Respondent concluded that adoption of the *62 plan was not a project, appellant Muzzy Ranch Co. challenged that conclusion by petition for writ of mandate, and the trial court denied the petition. We reverse, holding that adoption of the plan was a project because it has the potential to result in physical change to the environment by displacing housing development from the Travis vicinity to elsewhere in the region. In the unpublished portion of this opinion, we address appellant's arguments related to Air Force land use compatibility studies for Travis.

FACTUAL AND PROCEDURAL BACKGROUND
Respondent Solano County Airport Land Use Commission (Commission) was established under the State Aeronautics Act (Pub. Util.Code, § 21001 et seq.) for the purpose of "ensuring the orderly expansion of airports" and the adoption of appropriate land use measures in Solano County. (Pub.Util.Code, § 21670, subd. (a)(2).)
On June 13, 2002, the Commission adopted the Travis Air Force Base Land Use Compatibility Plan (TALUP). The TALUP "sets forth land use compatibility policies applicable to future development in the vicinity of" Travis Air Force Base. "The policies are designed to ensure that future land uses in the surrounding area will be compatible with the realistically foreseeable, ultimate potential aircraft activity at the base." The compatibility policies in the TALUP are "intended to be reflected in the general plans and other policy instruments adopted by the entities having jurisdiction over land uses near Travis Air Force Base." Accordingly, the TALUP "affects and requires action by" the County of Solano and the cities of Dixon, Fairfield, Suisun City, and Vacaville. The TALUP also potentially impacts three other cities in Solano County and small portions of Napa and Yolo Counties.
The TALUP sets forth compatibility factors applicable to six geographic zones of various sizes around the airport. At issue in this case is "Compatibility Zone C," which "encompasses locations exposed to potential noise in excess of approximately 60 dB CNEL[1] together with additional areas occasionally affected by concentrated numbers of low-altitude (below 3,000 feet MSL) aircraft overflights," excluding "[d]eveloped residential areas within existing city limits." Although the TALUP does not provide acreage or square mile measurements, it is clear from a map provided in the plan that Compatibility Zone C covers a very large land area within Solano County. Appellant asserts without objection from the Commission that Compatibility Zone C "encompasses hundreds of thousands of acres of private property in a wide swath [of] more than 600 square miles extending more than 35 miles through Solano County."
The TALUP freezes future residential development within Compatibility Zone C at the level permitted under current general plans and zoning regulations. It states, "No amendment of a general plan land use policy or land use map designation and no change of zoning shall be permitted if such amendment or change would allow more dwelling units in the affected area than are allowed under current zoning." It further states that "[t]o the greatest extent feasible, it is the objective of the [TALUP] to minimize new residential development within" Compatibility Zone C.
*63 On June 18, 2002, the Commission filed a "Notice of Exemption" declaring that adoption of the TALUP is exempt from CEQA because such act was not a "project" within the meaning of CEQA.
Appellant is a limited partnership holding ownership interests in thousands of acres of property within the boundaries of the TALUP. On July 9, 2002, appellant filed a petition for writ of mandate and complaint for declaratory relief. Among other things, appellant contended that adoption of the TALUP violated CEQA and that the Commission abused its discretion by basing its land use restrictions on the noise limit standards and definition of the Travis "maximum mission" in the TALUP.
The trial court issued an order denying the petition on November 5, 2003. Judgment was entered on December 4, 2003.

DISCUSSION

I. The State Aeronautics Act and Airport Land Use Commissions

Article 3.5 of Chapter 4 of the State Aeronautics Act (Pub. Util.Code, § 21001 et seq.) provides for the establishment of Airport Land Use Commissions (ALUCs) in California counties "to protect public health, safety, and welfare by ensuring the orderly expansion of airports and the adoption of land use measures that minimize the public's exposure to excessive noise and safety hazards within areas around public airports to the extent that these areas are not already devoted to incompatible uses." (Pub.Util.Code, § 21670, subd. (a)(2).)
The powers and duties of ALUCs are described in Public Utilities Code section 21674. Those powers and duties include: "(a) To assist local agencies in ensuring compatible land uses in the vicinity of all new airports and in the vicinity of existing airports to the extent that the land in the vicinity of those airports is not already devoted to incompatible uses. [¶] (b) To coordinate planning at the state, regional, and local levels so as to provide for the orderly development of air transportation, while at the same time protecting the public health, safety, and welfare. [¶] (c) To prepare and adopt an airport land use compatibility plan pursuant to Section 21675. [¶] (d) To review the plans, regulations, and other actions of local agencies and airport operators pursuant to Section 21676." (Pub.Util.Code, § 21674.)
At issue in this case is the adoption of an airport land use compatibility plan. "Each commission shall formulate an airport land use compatibility plan that will provide for the orderly growth of each public airport and the area surrounding the airport within the jurisdiction of the commission, and will safeguard the general welfare of the inhabitants within the vicinity of the airport and the public in general." (Pub.Util. Code, § 21675, subd. (a).)[2] Commissions are also now obligated to formulate such plans for areas surrounding military airports, such as Travis Air Force Base; at the time the TALUP was adopted Commissions were authorized to adopt land use plans for military airports but not required to do so. (Pub.Util.Code, § 21675, subd. (b), as amended by Stats.2002, ch. 971, § 7.) To assist ALUCs in the performance of their duties, the California Department of Transportation prepared the California Airport Land Use Planning Handbook. "An airport land use commission that formulates, adopts, or amends an airport land use compatibility plan shall be guided by" the Handbook. (Pub.Util.Code, § 21674.7, subd. (a).)
A city or county general plan relating to an area covered by an ALUC land use plan must be consistent with the commission's plan, unless the city or county governing body overrides the determination of *64 the commission by a two-thirds vote. (Gov.Code, § 65302.3; Pub. Util.Code, § 21676, subd. (b).) The governing body must make specific findings that the portions of its general plan at issue are consistent with the purposes of Article 3.5, as stated in Public Utilities Code section 21670. (Gov.Code, § 65302.3, subd. (c); Pub. Util.Code, § 21676, subd. (b).) Similarly, if a city or county proposes to amend its general plan or zoning ordinances within the planning area of an ALUC, it must first submit its proposed action to the commission for a determination of whether the action is consistent with the commission's land use plan. (Pub.Util.Code, § 21676, subd. (b).) The city or county may override the determination of the commission with a two-thirds vote of its governing body based on specific findings that the proposed action is consistent with the purposes of Article 3.5, as stated in section 21670. (Pub.Util.Code, § 21676, subd. (b).)
The central issue in this appeal is whether the Commission's adoption of the TALUP was a "project" as that term is used in CEQA. (Pub. Resources Code, § 21000 et seq.[3])

II. The California Environmental Quality Act

"The Legislature enacted CEQA in an effort to interpose some mandatory level of institutional concern for the environment into the public agency decisionmaking process. [Citation.] Essentially, CEQA requires government agencies to prepare an environmental impact report (EIR) for any project they carry out or approve which may have a significant effect on the environment. (§ 21151.) The purpose of an [EIR] is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project. (§ 21061.)" (Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist. (1992) 9 Cal.App.4th 464, 467, 11 Cal.Rptr.2d 792 (Kaufman & Broad).) "The EIR has been aptly described as the `heart of CEQA.' [Citations.] Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions before they are made. Thus, the EIR protects not only the environment but also informed self-government. [Citation.]" (Citizens of Goleta Valley v. Board of Supervisors (1990) 52 Cal.3d 553, 564, 276 Cal.Rptr. 410, 801 P.2d 1161 (Citizens of Goleta Valley).) Public Resources Code section 21168.5 authorizes use of a petition for writ of mandate to set aside an action of a public agency for noncompliance with CEQA. (Friends of Sierra Madre v. City of Sierra Madre (2001) 25 Cal.4th 165, 196, 105 Cal.Rptr.2d 214, 19 P.3d 567 (Friends of Sierra Madre).)
CEQA and the State CEQA Guidelines (Cal.Code Regs., tit. 14, § 15000 et seq., hereafter Guidelines)[4] establish a three-tiered review process. (Friends of Sierra Madre, supra, 25 Cal.4th at p. 185, 105 Cal.Rptr.2d 214, 19 P.3d 567.) "The first tier is jurisdictional, requiring that an *65 agency conduct a preliminary review in order to determine whether CEQA applies to a proposed activity." (Davidon Homes v. City of San Jose (1997) 54 Cal.App.4th 106, 112, 62 Cal.Rptr.2d 612 (Davidon Homes), emphasis added, citing Guidelines, §§ 15060, 15061.) The first inquiry is for the agency to determine whether the activity at issue is a project within the meaning of CEQA. (East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist. (1989) 210 Cal.App.3d 155, 165, fn. 5, 258 Cal.Rptr. 147; see also Guidelines, § 15061, subd. (a).) If not, the activity is not subject to CEQA. (Davidon Homes, at p. 112, 62 Cal.Rptr.2d 612; Guidelines tit. 14, § 15060, subd. (c).) Also exempted from CEQA at the first tier of review are ministerial projects, projects falling under various categorical exemptions, and projects falling within the "common sense exception" applicable "[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment...." (Davidon Homes, at p. 112, 62 Cal.Rptr.2d 612; Guidelines, tit. 14, §§ 15060, 15061.)
If the activity is a project and does not fall within any of the specified exceptions, then the agency must proceed to the second tier of review and "conduct an initial study to determine if the project may have a significant effect on the environment." (Guidelines, tit. 14, § 15063; see also Davidon Homes, supra, 54 Cal.App.4th at p. 113, 62 Cal.Rptr.2d 612.) If the agency determines there is no substantial evidence that the project may cause a significant effect on the environment, then the agency need not prepare an EIR, but it must prepare a negative declaration, briefly describing the reasons supporting its determination. (Guidelines, tit. 14, § 15063, subd. (b)(2); Davidon Homes, at p. 113, 62 Cal.Rptr.2d 612.) If, on the other hand, the agency determines that there is substantial evidence that the project may cause a significant effect on the environment then the agency must proceed to the third tier of the review process and prepare a full EIR. (Guidelines, tit. 14, § 15063, subd. (b)(1); Davidon Homes, at p. 113, 62 Cal.Rptr.2d 612.) Here, the Commission concluded that approval of the TALUP was not a "project."
The term "project" is broadly defined and includes "activit[ies] directly undertaken by any public agency" that "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (§ 21065.) The Guidelines further define a project as "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and that is any of the following: [](1) An activity directly undertaken by any public agency including but not limited to public works construction and related activities[,] clearing or grading of land, improvements to existing public structures, enactment and amendment of zoning ordinances, and the adoption and amendment of local General Plans or elements thereof...." (Guidelines, tit.14, § 15378, subd. (a)(1); see also Black Property Owners, supra, 22 Cal. App.4th at pp. 983-984, 28 Cal.Rptr.2d 305.)
Whether an act constitutes a "project" within the purview of CEQA is an issue of law which can be decided on the undisputed data in the record on appeal and presents no question of deference to agency discretion or review of substantiality of evidence. (Fullerton Joint Union High School Dist. v. State Bd. of Education (1982) 32 Cal.3d 779, 794-795, 187 Cal.Rptr. 398, 654 P.2d 168 (Fullerton); Black Property Owners, supra, 22 Cal. App.4th at p. 984, 28 Cal.Rptr.2d 305; see § 21168.5.) In determining whether adoption of the TALUP was a project, we are *66 mindful that "[t]he foremost principle under CEQA is that the Legislature intended the act to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.'" (Laurel Heights Improvement Assn. v. Regents of University of California, (1988) 47 Cal.3d 376, 390, 253 Cal.Rptr. 426, 764 P.2d 278 (Laurel Heights).)

III. Application of CEQA to the TALUP

Appellant contends that the trial court erred in concluding that the Commissions adoption of the TALUP was not a project within the meaning of CEQA. In particular, appellant contends that the TALUP has the potential for causing indirect physical change to the environment by displacing to other parts of the region housing development that would otherwise occur in TALUP's Compatibility Zone C. The Commission's primary contention is that any such displacement is too speculative or remote to be considered a reasonably foreseeable effect of the Commission's activity, emphasizing that the TALUP merely recommends that County and city general plans and ordinances not be amended to allow more dwelling units in the affected area than are allowed under current zoning.

A. Appellant Does Not Bear the Burden of Proving Potential Housing Displacement

Before turning to the Commission's arguments that any housing displacement would be too speculative or remote to support a determination that adoption of the TALUP was a project, we consider its contention that there is inadequate support in the record for appellant's allegations of housing displacement. The Commissions argument assumes that appellant bears the burden of presenting evidence in support of its allegations of potential impact on the environment. We reject that allocation of the burden of proof because this case arises in the context of the first tier of CEQA review.
The first tier review involves several different determinations. Initially, an agency must determine whether its activity "may" or "has a potential" to cause physical change to the environment. (§ 21065; Guidelines, tit. 14, § 15378, subd. (a)(1).) If so, then the activity is a "project" subject to CEQA. But a determination that an activity is a project does not always require an EIR. At the first tier, an agency need not produce an EIR if its preliminary review shows that the project falls within the scope of a categorical exemption or the so-called "common sense exemption." (Guidelines, tit.14, § 15061, subd. (b)(3).) The latter exemption applies where "[t]he activity is covered by the general rule that CEQA applies only to projects which have the potential for causing a significant effect on the environment. Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA." (Guidelines, tit.14, § 15061, subd. (b)(3).) In Davidon Homes, supra, 54 Cal.App.4th 106, 62 Cal.Rptr.2d 612, the Sixth District held that objectors to an agency's determination that its project fell within the common sense exemption did not bear the burden of presenting evidence supporting their allegations of potential environmental impacts. The court explained that the exemption "requires the agency to be certain that there is no possibility the project may cause significant environmental impacts. If legitimate questions can be raised about whether the project might have a significant impact and there is any dispute about the possibility of such an impact, the agency cannot find with certainty that a project is exempt." (Davidon Homes, at p. 117, 62 Cal.Rptr.2d 612.)
*67 It would be paradoxical for us to conclude here that an objector bears the burden of presenting evidence supporting allegations of potential environmental impacts at the threshold project determination, but does not bear that burden at the subsequent "common sense exemption" determination, as the Davidon Homes court held. We adapt language from Davidon Homes, which considered whether a project was exempt from CEQA, to our determination of whether the TALUP is a project: "Imposing the burden on members of the public in the first instance to prove a possibility for [physical change to the environment] would frustrate CEQA's fundamental purpose of ensuring that government officials make decisions with environmental consequences in mind.'" (Davidon Homes supra, 54 Cal.App.4th at p. 116, 62 Cal.Rptr.2d 612, quoting Bozung v. Local Agency Formation Com. (1975) 13 Cal.3d 263, 283, 118 Cal.Rptr. 249, 529 P.2d 1017 (Bozung).) At this first stage in the CEQA review process appellant was only required to present a "reasonable argument" that adoption of the TALUP has the potential to result in physical change to the environment. (See Davidon Homes, at p. 118, 62 Cal.Rptr.2d 612.)
The Commission concedes that "[p]opulation growth is already taking place in the Solano County area and housing will be built to accommodate this growth." It is noteworthy that according to the 1990 TALUP, amended in 1994, Solano County and its cities "are experiencing more pressure to urbanize the undeveloped lands throughout the County including vacant land around the Air Base." Also according to the 1990 TALUP, the Association of Bay Area Governments projected that Solano County "will be the fastest growing county in the nine-county San Francisco Bay Region." The 2000 TALUP conspicuously omits any findings on this issue, but there is no indication that the trends have reversed. Considering the size of the land area covered by the TALUP's Compatibility Zone C, it is reasonable for appellant to argue that housing construction that would otherwise ultimately occur in that zone will now need to be built elsewhere. Where growth places development pressures on an area, it is reasonable to assume that general plans will be amended to accommodate some of that development pressure, absent an obstacle to amendment such as the TALUP. (See Stanislaus Audubon Society, Inc. v. County of Stanislaus (1995) 33 Cal.App.4th 144, 156-157, 39 Cal.Rptr.2d 54 (Stanislaus Audubon) [agency must prepare EIR to consider growth-inducing effects of country club even though surrounding area zoned for agricultural use].) "Zoning is subject to change and amendment of a general plan is not a rare occurrence." (Id. at p. 157, 39 Cal.Rptr.2d 54.) Appellant has presented a reasonable argument that adoption of the TALUP may result in housing displacement.

B. Housing Displacement Is Not Too Speculative to Trigger a Determination That Adoption of the TALUP Was a Project

The Commission contends that as a matter of law it had no duty to consider potential housing displacement effects, because to consider those effects would require it to speculate about other agencies' future land use decisions. In particular, it would need to speculate about what expansion in housing development might have been permitted in the TALUP area absent the conclusion that the status quo should be maintained and to speculate about future land use decisions outside the TALUP area.
Effects on housing development are, as a general matter, a type of physical change that may trigger the need to prepare an *68 EIR under CEQA. In describing the types of environmental effects which should be discussed in an EIR, the Guidelines refer to "changes induced in population distribution, population concentration, the human use of the land (including commercial and residential development)," and "the ways in which the proposed project could foster economic or population growth, or the construction of additional housing, either directly or indirectly, in the surrounding environment." (Guidelines, tit.14, § 15126.2, subds.(a), (d).) Cases on this issue frequently involve projects that directly lead to housing development by inducing population growth in the vicinity of the project. (See, e.g., City of Antioch v. City Council (1986) 187 Cal.App.3d 1325, 1337, 232 Cal.Rptr. 507 (City of Antioch) [construction of a road and sewer would provide a catalyst for further development in the immediate area]; Stanislaus Audubon, supra, 33 Cal.App.4th at pp. 152-153, 156-158, 39 Cal.Rptr.2d 54 [construction of a country club and golf course would attract development of housing nearby].) The effects on housing development in this case are less direct, because the TALUP potentially affects the environment not by inducing housing development in the area covered by the TALUP but by displacing development to other areas.
In support of its argument that housing displacement effects are too speculative to render adoption of the TALUP a project, the Commission cites this district's decision in Marin Mun. Water Dist. v. KG Land California Corp. (1991) 235 Cal. App.3d 1652, 1 Cal.Rptr.2d 767 (Marin Mun. Water Dist.). The Marin Municipal Water District declared a water shortage emergency and imposed a five- to six-year moratorium on new service areas, pending the development of new water supplies. Despite its doubts whether the moratorium was a project within the meaning of CEQA, the district proceeded with an EIR, which concluded that the moratorium would have no significant adverse environmental effects. (Marin Mun. Water Dist., at pp. 1658-1659, 1 Cal.Rptr.2d 767.) Developers challenged the EIR, claiming the EIR failed to adequately evaluate the adverse environmental consequences, including the effect on housing development outside the district. (Id. at p. 1661, 1 Cal. Rptr.2d 767.)
This court concluded that the EIR was adequate. The EIR acknowledged that a moratorium of longer than five or six years could result in increased pressure for growth and development in areas outside the district's service area. However, any such future development would be dependent on what those local agencies permit, and the environmental consequences would necessarily be considered in subsequent environmental impact reports. This court held that the district reasonably concluded that the potential environmental impact of possible future development elsewhere was simply too speculative to evaluate. (Marin Mun. Water Dist., supra, 235 Cal. App.3d at pp. 1662-1663, 1 Cal.Rptr.2d 767.) In support of its reasoning regarding the limits of the required analysis, the court quoted section 15145 of the Guidelines which states, "`If, after thorough investigation, a lead agency finds that a particular impact is too speculative for evaluation, the agency should note its conclusion and terminate discussion of the impact.'" (Marin Mun. Water Dist., at p. 1662, 1 Cal.Rptr.2d 767, quoting Guidelines, tit. 14, § 15145.) Marin Mun. Water Dist. is readily distinguished from the case at hand where there has been no thorough investigation and EIR. The case does not stand for the proposition that housing displacement effects are always too speculative to require preparation of an EIR. Instead, it stands for the proposition that, after thorough investigation, an *69 EIR need not discuss impacts it reasonably concludes are too speculative.
In Napa Citizens for Honest Government v. Napa County Bd. of Supervisors (2001) 91 Cal.App.4th 342, 110 Cal.Rptr.2d 579 (Napa Citizens), this district again applied CEQA to a project with effects on housing development outside the project area. In Napa Citizens, an EIR was prepared regarding plans to develop an unincorporated area surrounding the county airport. (Id. at pp. 351-352, 110 Cal. Rptr.2d 579.) The plan projected creation of a substantial number of new jobs, but it included no residential construction because of the proximity to the airport. (Id. at p. 367, 110 Cal.Rptr.2d 579.) The court emphasized that EIR review cannot be avoided "simply because the project's effect on growth and housing will be felt outside of the project area. Indeed, the purpose of CEQA would be undermined if the appropriate governmental agencies went forward without an awareness of the effects a project will have on areas outside of the boundaries of the project area." (Napa Citizens, at p. 369, 110 Cal.Rptr.2d 579.)
Housing displacement is a physical change that may require discussion in an EIR. Appellant contends that limitations on housing development in TALUP Compatibility Zone C will eventually lead to increased demand in other parts of the region. Study by the Commission at subsequent stages of the CEQA review process can provide information about the likelihood and scope of such displacement, but the possibility that the displacement effect will be too speculative to gauge with reasonable accuracy is not a basis for concluding that adoption of the TALUP was not a project. (See Laurel Heights, supra, 47 Cal.3d at p. 399, 253 Cal.Rptr. 426, 764 P.2d 278 ["The fact that precision may not be possible, however, does not mean that no analysis is required."]; Stanislaus Audubon, supra, 33 Cal.App.4th at p. 158, 39 Cal.Rptr.2d 54 ["The fact that the exact extent and location of such growth cannot now be determined does not excuse the County" from complying with CEQA]; Guidelines tit. 14, § 15144 [compliance with CEQA "necessarily involves some degree of forecasting ... an agency must use its best efforts to find out and disclose all that it reasonably can"].)
We acknowledge that potential difficulties with forecasting environmental effects may be relevant in determining the scope of an EIR, should the Commission eventually prepare one. As the Napa Citizens court pointed out, "[i]t does not follow . . . that an EIR is required to make a detailed analysis of the impacts of a project on housing and growth. Nothing in the Guidelines, or in the cases, requires more than a general analysis of projected growth. The detail required in any particular case necessarily depends on a multitude of factors, including, but not limited to, the nature of the project, the directness or indirectness of the contemplated impact and the ability to forecast the actual effects the project will have on the physical environment. In addition, it is relevant, although by no means determinative, that future effects will themselves require analysis under CEQA." (Napa Citizens, supra, 91 Cal.App.4th at p. 369, 110 Cal.Rptr.2d 579.)
Increased housing development in areas outside the project area is a physical change to the environment, whether because the agency's activity will increase the total anticipated regional population or because the activity will affect where the anticipated population can be housed. This conclusion is particularly appropriate in light of our obligation to interpret CEQA so as "to afford the fullest possible protection to the environment within the *70 reasonable scope of the statutory language." (Friends of Mammoth v. Board of Supervisors (1972) 8 Cal.3d 247, 259, 104 Cal.Rptr. 761, 502 P.2d 1049.)

C. The Housing Displacement Is Not Too Remote Under the "Chain of Events" Test

The Commission contends that adoption of the TALUP does not qualify as a project under the "chain of events" test. Under that test, for an activity to be a "project" requiring environmental review it need not have a direct effect on the environment, but it must be "a necessary step in a chain of events which would culminate in physical impact on the environment." (Fullerton, supra, 32 Cal.3d at p. 795, 187 Cal.Rptr. 398, 654 P.2d 168.)
The Commission contends that appellant has not established a causal link between adoption of the TALUP and the displacement of housing construction to other areas because "the TALUP does not cause new housing to be developed; it simply recommends that the County and the cities should not allow the development of new housing within Compatibility Zone C at densities greater than allowed by current zoning." The Commission relies principally upon Kaufman & Broad, supra, 9 Cal. App.4th 464, 11 Cal.Rptr.2d 792, which applied the chain of events test to a school district's resolution to establish a community facilities district to raise funds for future acquisition of school sites in anticipation of population growth. The court concluded that formation of the district was not a project under CEQA because there was no causal link between that action and the ultimate alleged environmental impact, construction of new schools. (Kaufman & Broad, at p. 474, 11 Cal. Rptr.2d 792.) The court emphasized that ongoing development would require the construction of new schools regardless of whether a financing district was formed and formation of the district did not commit the agency to any specific course of conduct. (Id. at pp. 474, 476, 11 Cal. Rptr.2d 792.)
Our case is less like Kaufman & Broad and more like the California Supreme Court decision in Fullerton, supra, 32 Cal.3d 779, 187 Cal.Rptr. 398, 654 P.2d 168. In Fullerton, the Supreme Court held that a proposed reconfiguration of school districts was a project because the action would likely cause the construction of a new high school, might cause the abandonment of other facilities, and would affect bus routes and traffic patterns. (Fullerton, 32 Cal.3d at p. 794, 187 Cal. Rptr. 398, 654 P.2d 168.) This was so even though the proposal had to be submitted to voters for ratification. (Id. at pp. 795-796, 187 Cal.Rptr. 398, 654 P.2d 168.) The Fullerton Court discussed two other decisions, its prior decision in Bozung, supra, 13 Cal.3d 263, 118 Cal.Rptr. 249, 529 P.2d 1017, and the decision in Simi Valley Recreation Park Dist. v. Local Agency Formation Com. (1975) 51 Cal.App.3d 648, 124 Cal.Rptr. 635 (Simi Valley). In Bozung, the Supreme Court held that a Local Agency Formation Commission (LAFCO) decision to approve an annexation proposal where development was anticipated constituted a project. (Bozung, at pp. 269-270, 278-279, 118 Cal.Rptr. 249, 529 P.2d 1017.)[5] In Simi Valley, the court held that a LAFCO approval of detachment of land from a recreation and park district was not a project where the activity was *71 only a "change of organization or personnel," the only environmental impact of which was the replacement of one group of managers by others who might hold different views on the future use of the land in question. (Simi Valley, at pp. 652, 666, 124 Cal.Rptr. 635; see also Fullerton, at p. 796, 187 Cal.Rptr. 398, 654 P.2d 168.) The Fullerton Court concluded that the difference between Bozung and Simi Valley was the difference between an action "which constitutes an essential step culminating in action which may affect the environment (Bozung) and approval of a reorganization which portends no particular action affecting the environment (Simi Valley)." (Fullerton, 32 Cal.3d at p. 797, 187 Cal. Rptr. 398, 654 P.2d 168.)
In both Kaufman & Broad and Simi Valley, relied upon by the Commission, the actions at issue (establishment of a school financing district and detachment of land from a park district) essentially left open whether any actual physical change would ultimately take place. In contrast, in Fullerton and Bozung, the actions at issue (reconfiguration of a school district and approval of annexation to facilitate a project) represented critical and conclusive steps that would foreseeably result in environmental change of some sort, even if the actual nature of the change was uncertain. In this case, adoption of the TALUP is a conclusive step on the part of the Commission, which will foreseeably lead to some displacement of future development to outside the TALUP area.
The analysis does not change simply because localities may override the TALUP's land use restrictions. Fullerton rejected a similar contention that the school board's approval of reorganization was not subject to CEQA because it would have to be ratified by voters. (Fullerton, 32 Cal.3d at p. 796, 187 Cal.Rptr. 398, 654 P.2d 168; see also Edna Valley Assn. v. San Luis Obispo County etc. Coordinating Council (1977) 67 Cal.App.3d 444, 448, 136 Cal.Rptr. 665 (Edna Valley Assn.) [adoption of regional transportation plan a project despite requirement of adoption by State Transportation Board].) The Court emphasized that the school boards approval was a statutory critical first step in the process. (Fullerton, at p. 796, 187 Cal. Rptr. 398, 654 P.2d 168.) Here, the Commission was authorized by statute to formulate a land use plan for the area surrounding Travis Air Force Base (it is now required to formulate such a plan). (Pub. Util.Code, § 21675, subd. (a).) The adoption of such a plan triggers procedures to ensure the consistency of local general plans with the Commissions plan. (Pub. Util.Code, § 21676; Gov.Code, § 65302.3.) That the Commissions determinations may be overridden by a two-thirds vote of a local governing body does not diminish the significance of the Commissions adoption of the plan, which sets the process in motion and can be expected to carry some authority. It is a necessary step in the chain of events.

D. Analogy to Adoption or Amendment of General Plans

Although we conclude that adoption of the TALUP was a project under the chain of events test, the cases that apply that test typically involve narrow activities relating to particular developments or parcels of land rather than the type of broad policymaking involved in adoption of the TALUP. This districts decision in City of Livermore v. Local Agency Formation Com. (1986) 184 Cal.App.3d 531, 230 Cal. Rptr. 867 (City of Livermore), further supports the conclusion that the type of policymaking at issue here is a project under CEQA.
In City of Livermore, the City brought suit against the Alameda County Local *72 Agency Formation Commission, seeking to prevent the LAFCO from implementing revised sphere of influence guidelines. Even though the guidelines did not themselves directly affect any specific development, the court concluded that adoption of the revised guidelines constituted a project. The court stated, "[t]he sphere of influence guidelines influence LAFCO decisions about development plans and future growth of cities and service areas. The guidelines play a part in determining whether growth will occur in unincorporated areas and whether agricultural land will be preserved or developed. They may change the focus of urban development by promoting county plans over city plans. These potential effects will certainly impact the environment. It is true that the precise effects are difficult to assess at this stage, but it is because impact is so easily foreseen that the revisions must be considered a project under CEQA." (City of Livermore, supra, 184 Cal.App.3d at p. 538, 230 Cal.Rptr. 867.)
City of Livermore drew an analogy between adoption of the revised guidelines and amendment of a general plan. (City of Livermore, supra, 184 Cal.App.3d at p. 539, 230 Cal.Rptr. 867.) It is well established that, generally, amendment of a general plan is subject to environmental review under CEQA. (DeVita v. County of Napa (1995) 9 Cal.4th 763, 793-794, 38 Cal.Rptr.2d 699, 889 P.2d 1019 (DeVita); see also Guidelines, tit. 14, § 15378, subd. (a)(1).) General plans "embody fundamental land use decisions that guide the future growth and development of cities and counties. The adoption or amendment of general plans perforce have a potential for resulting in ultimate physical changes in the environment." (City of Santa Ana v. City of Garden Grove (1979) 100 Cal. App.3d 521, 532, 160 Cal.Rptr. 907 (City of Santa Ana); accord DeVita, at p. 795, 38 Cal.Rptr.2d 699, 889 P.2d 1019; Black Property Owners, supra, 22 Cal.App.4th at p. 985, 28 Cal.Rptr.2d 305.) The City of Livermore court pointed out that the revised guidelines would also "influence the future growth and development of cities" by potentially promoting urbanization outside existing cities, perhaps having an even greater impact than the amendment of one general plan. (City of Livermore, at p. 539, 230 Cal.Rptr. 867; see also Edna Valley Assn., supra, 67 Cal.App.3d at p. 448, 136 Cal.Rptr. 665 [adoption of regional transportation plan similar to adoption of a local general plan].)
The same reasoning applies in this case. Although it is presently unclear precisely how adoption of the TALUP will affect the environment, it is undeniable that placing a vast area of land largely off-limits to future residential development will have long term impacts on the use of land and population distribution in the region. As with the adoption or amendment of a general plan, the application of CEQA to adoption of the TALUP "comports with the policy that the environmental consequences of a proposed activity, whether public or private, be considered at the earliest possible stage. `Obviously it is desirable that the precise information concerning environmental consequences which an EIR affords be furnished and considered at the earliest possible stage. The Guidelines express this principle in a variety of ways. Thus, "EIR's should be prepared as early in the planning process as possible to enable environmental considerations to influence project, program or design." ([Guidelines], § 15013.)'" (City of Santa Ana, supra, 100 Cal.App.3d at p. 533, 160 Cal.Rptr. 907, quoting Bozung, supra, 13 Cal.3d at p. 282, 118 Cal.Rptr. 249, 529 P.2d 1017.)
That future development projects outside the TALUP area will be subject to *73 CEQA review is not a satisfactory rationale for delaying an EIR. Future review will ensure consideration and mitigation of environmental effects for each of those projects; it is not a substitute for consideration and notice to the public of the overall effect of restricting development in the TALUP area. To permit adoption of the TALUP with no consideration or notice of environmental effects of the plan as a whole would result in a "piecemeal review in which `environmental considerations ... become submerged by chopping a large project into many little ones  each with a minimal potential impact on the environment  which cumulatively may have disastrous consequences.' [Citations.]" (City of Antioch, supra, 187 Cal.App.3d at p. 1333, 232 Cal.Rptr. 507.) Application of CEQA to adoption of the TALUP ensures that the public (including Solano County and neighboring counties and cities) will be informed of the general potential consequences before greater development pressure builds in other parts of the region. (See Stanislaus Audubon, supra, 33 Cal. App.4th at pp. 158-159, 39 Cal.Rptr.2d 54 [preparation of an EIR "cannot be postponed until such effects have already manifested themselves through requests for amendment of the general plan and applications for approval of housing developments"].)

IV. Air Force Land Use Compatibility Studies[**]

DISPOSITION
The judgment is reversed. The matter is remanded to the trial court with directions that the court issue a writ of mandate ordering the Commission to set aside its adoption of the 2002 TALUP due to its failure to comply with CEQA. Appellant is awarded its costs on appeal.
We concur. STEVENS, ACTING P.J., and SIMONS, J.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV.
[1] "60 dB CNEL" means 60 decibel "community noise equivalent level," which "represents the average daytime noise level during a 24-hour day, adjusted to an equivalent level to account for the lower tolerance of people to noise during evening and nighttime periods relative to the daytime period."
[2] Section 21675 was amended in 2004, effective January 1, 2005, to make technical non-substantive changes. (Stats. 2004, ch. 615, § 4; see also Legisl. Counsel's Digest, § 2, at p. 91.) We quote the current statutory language.
[3] All further statutory references are to the Public Resources Code unless otherwise noted.
[4] Public Resources Code section 21083 authorizes the preparation and development of Guidelines. The Guidelines are to be afforded great weight except when clearly unauthorized or erroneous under CEQA. (Black Property Owners Assn. v. City of Berkeley (1994) 22 Cal.App.4th 974, 983, 28 Cal.Rptr.2d 305, fn. 6 (Black Property Owners), citing Citizens of Goleta Valley, supra, 52 Cal.3d at p. 564, fn. 3, 276 Cal.Rptr. 410, 801 P.2d 1161.)
[5] LAFCOs exist for the purposes of discouraging urban sprawl, encouraging orderly development, and coordinating the needs of local governmental agencies. (Gov.Code, § 54774.) A LAFCO determines a "sphere of influence" for each local governmental agency within the county. (Ibid.)
[**] See footnote *, ante.