Filed 7/14/16  City of Selma v. City of Kingsburg CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CITY OF SELMA, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF KINGSBURG, <br><br> Defendant and Respondent. | F071156 <br><br> (Super. Ct. No. 12CECG03223) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

Costanzo & Associates and Neal E. Costanzo for Plaintiff and Appellant.

Kahn, Soares & Conway, Rissa A. Stuart and Michael J. Noland for Defendant and Respondent.

-ooOoo-

### INTRODUCTION

The City of Kingsburg (Kingsburg) recently expanded its boundaries by annexing approximately 430 acres of land.  Before approving the annexation, Kingsburg concluded the project would not cause any unmitigated significant environmental impacts.  Accordingly, Kingsburg prepared a mitigated negative declaration.

Shortly after approving the annexation, Kingsburg repealed certain design standards applicable to the annexation area. Kingsburg determined the repeal was exempt from the California Environmental Quality Act (CEQA) (Pub. Resources Code,[1] § 21000 et seq.) because it was "certain" there was "no potential" for the repeal to cause environmental impacts. (See Cal. Code Regs., tit. 14, § 15061, subd. (b)(3) [commonsense exemption].)[2]

With respect to the annexation project, we conclude the City of Selma (Selma) has failed to carry its burden in challenging Kingsburg's CEQA compliance. However, with respect to the repeal of the design standards, we conclude Kingsburg failed to carry its burden of demonstrating the commonsense exemption to CEQA applies.

Consequently, we affirm the judgment denying Selma's petition for a writ of mandate concerning the annexation project, and we reverse the judgment denying Selma's petition for a writ of mandate concerning the repeal of the design standards.

## FACTUAL AND PROCEDURAL HISTORY

### I.     The Annexation Project

#### A.     Background

A city may pass a resolution seeking to annex territory into its boundaries. (See Gov. Code, § 56375, subd. (a)(4).) In 2012, Kingsburg studied a proposed project to annex approximately 430 acres of land in Fresno County (the Annexation Territory). The Annexation Territory is "roughly triangular in shape" and "generally bounded by Mountain View Avenue on the north, Bethel Avenue on the east, and State Route 99 along the south and west." Three hundred and fifty acres of the Annexation Territory was already developed "with industrial/commercial uses." Another 52 acres were

---

[1]Undesignated statutory references are to the Public Resources Code.

[2]The Guidelines for the Implementation of the California Environmental Quality Act (Cal. Code Regs., tit. 14, § 15000 et seq.) will hereinafter be referred to as the CEQA Guidelines.

undeveloped, and the remainder of the Annexation Territory consists of street rights-of-way. The Annexation Territory is home to facilities run by Sun-Maid Growers of California, Vie-Del Company, and Guardian Industries Corp.

The proposal provided that a portion of the Annexation Territory would be annexed to the Selma-Kingsburg-Fowler County Sanitation District. The project also involved detaching the Annexation Territory from the Fresno County Fire Protection District, the Consolidated Irrigation District, and the Kings River Conservation District. Finally, the project included prezoning a portion of the Annexation Territory.

### B. Initial Environmental Analyses

#### 1. Initial Study and Mitigated Negative Declaration

Kingsburg studied the annexation project, ostensibly to determine whether it may have a significant effect on the environment under CEQA. Kingsburg prepared a combined written initial study and mitigated negative declaration (MND) dated April 25, 2012. (See CEQA Guidelines, §§ 15365, 15369.5.) The study identified the environmental factors potentially affected by the project as: biological resources, greenhouse gas emissions, public services, agricultural resources, cultural resources, utilities/services systems, air quality, hydrology/water quality, noise, and transportation/traffic. The study found that with respect to each of the environmental factors, the project would either have no impact, a less than significant impact, or a less than significant impact with mitigation. As a result, Kingsburg concluded it could proceed with an MND rather than an environmental impact report (EIR). The MND's analysis is discussed in further detail below in connection with the issues raised on appeal.

### 2.     *Service Plan for the Annexation Territory*

Kingsburg prepared a document dated July 2012 entitled "City of Kingsburg Service Plan [for the] Guardian/Sun-Maid Reorganization" (Service Plan).[3]  It begins with a description of the Annexation Territory and the observation that "[a] plan for providing services and improvements to land being annexed to cities is required by the Local Agency Formation Commission (LAFCo) …."  It discusses several categories of local services, including water, sanitation, storm water drainage, solid waste collection, police and fire protection, ambulance and paramedic service, street lighting, parks and recreation, transit services, schools, public rights-of-way, and "[o]ther services."

With respect to water supply, the Service Plan indicated:

"Currently, the three industries that occupy all of the parcels within the subject territory have their own water systems.  The Guardian Industries glass plant, Vie-Del grape processing facility and Sun-Maid Growers raisin plant each have two on-site water wells.  Through an extra-territorial agreement with George and Lousie [*sic*] Alves, dba G & L Enterprises, 13281 Golden State Boulevard, to extend a water main from Kamm Avenue to Amber Lane [*sic*].  Once the annexation has been approved ownership of the water main will transfer to [Kingsburg] and be made available for connection to all adjoining properties."

Though the Service Plan is dated July 2012, there is evidence indicating it was prepared at a later date.  In an e-mail correspondence on November 2, 2012, staff at LAFCo informed Kingsburg staff that a service plan was required.  Kingsburg staff responded by asking what a service plan was, and they were provided an exemplar by LAFCo on November 8, 2012.  This information suggests the Service Plan was not prepared in July 2012, but rather sometime on or after November 8, 2012.

---

[3]This document appears in the record of proceedings of a separate CEQA lawsuit against the Fresno County Local Agency Formation Commission concerning the annexation project. This separate suit is discussed below.

### 3. *August 15, 2012, Staff Report*

Kingsburg's consulting Planning and Development Director, Darlene Mata, authored a staff report dated August 15, 2012. The report notes Kingsburg had entered into a "Transition Agreement" with the Fresno County Fire Protection District "wherein [Kingsburg] agree[d] to transfer certain tax revenues to the District for each annexation covered by the Transition Agreement." The report observes the term of the Transition Agreement would end on December 31, 2012, and Kingsburg was "currently in negotiations with the Fresno County Fire Protection District in hopes of agreeing upon the terms of a new Transition Agreement."

Mata's August 15, 2012, report also indicated Kingsburg had received a draft EIR for a project called "Selma Crossings." The Selma Crossings project was a proposal to develop approximately 307 acres adjacent to the Annexation Territory. The Selma Crossings project planned to include retail stores, offices, residences, an auto mall, two hotels, and a water park. Mata's report indicated the Selma Crossings project "will have significant and unavoidable environmental impacts." However, Mata's report concluded the planned annexation and prezoning actions do "not incrementally contribute to the [*sic*] any environmental impacts resulting from the Selma Crossings project …." (See CEQA Guidelines, § 15064, subd. (h).)

### C. City Council Actions in September 2012

On September 5, 2012, the Kingsburg City Council certified the MND and requested LAFCo initiate proceedings to effect the annexation. On September 19, 2012, the Kingsburg City Council prezoned approximately 183 acres of the Annexed Territory as "Highway Commercial" and "Light Industrial."

*Addendum to the MND*

At some point, an undated addendum to the MND was prepared (the Addendum).[4] The Addendum indicated the Transition Agreement between Kingsburg and the Fresno County Fire Protection District had expired. The Addendum stated the expiration of the Transition Agreement "will not result in new or increased impacts to fire protection services upon approval of the annexation as the agreement only addressed financial considerations." It then noted that the "City of Kingsburg Fire Department has sufficient capacity to service the proposed annexation area with both fire and emergency services."

## D. Filing of the Annexation Project Lawsuit

On October 5, 2012, Selma filed a petition for writ of mandate in superior court alleging, among other things, that Kingsburg failed to adequately consider the environmental impacts of the 430-acre annexation and prezoning project (the Annexation action).

## E. LAFCo Approval

LAFCo approved Kingsburg's annexation on July 17, 2013. On August 23, 2013, Selma filed suit in superior court challenging LAFCo's approval of the Kingsburg annexation on several grounds, including alleged CEQA violations (the LAFCo action). Because the LAFCo action was brought, in part, under CEQA, a record of proceedings was prepared.[5] (See § 21167.6.)

---

[4]Since the Transition Agreement was set to expire on December 31, 2012, and the Addendum refers to that expiration in the past tense, the Addendum was presumably prepared sometime after December 31, 2012. A version of the Addendum appearing in the LAFCo action's record of proceedings has a notation at the top that reads "Draft 040113," suggesting the document was completed sometime after April 1, 2013.

[5]The LAFCo action is not part of the present appeal. However, we granted Selma's motion to augment the appellate record in this case with the LAFCo action's record of proceedings. We expressly reserved ruling on whether, and to what extent, the LAFCo action's record of proceedings is relevant to the issues presented in this appeal.

6.

## II. The North Kingsburg Specific Plan

### A. Background

"'The Legislature has required every county and city to adopt "a comprehensive, long-term general plan for the physical development of the county or city…." (Gov. Code, § 65300.) A general plan provides a "'charter for future development'" and sets forth a city or county's fundamental policy decisions about such development.' [Citation.]" (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 508.) A city is also empowered to prepare "specific plans" to systematically implement the general plan "for all or part of the area covered by the general plan." (Gov. Code, § 65450.)

On July 6, 2005, Kingsburg adopted the "North Kingsburg Specific Plan" (NKSP). The NKSP was divided into seven parts. Part VI set forth community design standards for the industrial corridor. The community standards addressed various aspects of design, including building setbacks, architectural guidelines, off-street parking, landscape guidelines, walkways, bike lines, and signs.

### B. Guardian Industries Corp. Voices Concerns Relating to the NKSP

One of the largest commercial developments in the Annexation Territory is a glass manufacturing plant run by Guardian Industries Corp. (Guardian). In an April 4, 2013, letter, Guardian conveyed to Kingsburg its concerns about how "potentially inconsistent" provisions of the Kingsburg Municipal Code and the NKSP could affect potential future changes in the use of Guardian's property. The letter listed several concerns, such as Guardian's fear that the NKSP's requirement that electrical and telecommunication lines be "undergrounded" would "render any future expansion or modification to the [Guardian] facility infeasible."

7.

## C. Recommendations to Repeal Part VI of the NKSP

On May 15, 2013,[6] Mata advised the city council in a written report that "there are sections of the NKSP that would seem to impose very stringent requirements on the Guardian site if Guardian were to expand or modify the plant." The report also noted Guardian had submitted a letter to LAFCo opposing the annexation.

Mata recommended the city council repeal part VI of the NKSP, which would "eliminate the standards that are of concern to Guardian and allow staff the opportunity to draft more reasonable and consistent standards for the business uses in the Heavy Industrial zone district." The new standards would be considered by the planning commission and the city council at a future date.

## D. June 5, 2013, Report and Public Hearing

A report from Mata, dated June 5, 2013, recommended the city council find that repealing part VI of the NKSP is exempt from CEQA because it would "not result in a physical change to the environment." Mata observed that repealing part VI of the NKSP "would not result in a lack of standards for the NKSP Planning Area" because it "would be subject to the standards and policies found in the Zoning provisions of the Kingsburg Municipal Code for Light and Heavy Industrial zones."

Also on June 5, 2013, the Kingsburg City Council held a public hearing to consider repealing part VI of the NKSP. At the hearing, Mike Slater offered comments on behalf of the City of Selma. He submitted that repealing part VI of the NKSP was not categorically exempt from CEQA. Mata and the Kingsburg City Attorney responded that the repeal would not cause any physical changes to the environment.

---

[6]Mata's report is dated May 15, 2012. However, the year "2012" appears to be a typographical error as the report references Guardian's April 4, 2013, letter.

The mayor then closed the public hearing, after which the city council (1) found the repeal of part VI was exempt from CEQA, (2) adopted a categorical exemption to that effect, and (3) approved the general plan amendment.[7]

### E.    Notice of Exemption

On June 6, 2013, Kingsburg filed a notice of exemption indicating its repeal of part VI of the NKSP was statutorily exempt from CEQA.  (See § 21152, subds. (b)-(c); CEQA Guidelines, § 15374.)

### F.    Filing of the NKSP Action

On July 5, 2013, Selma filed a petition for writ of mandate in superior court alleging, among other things, that Kingsburg failed to consider the environmental impacts of its decision to repeal part VI of the NKSP (the NKSP action).

## III.    Trial Court Proceedings

### A.    Consolidation

On October 7, 2014, the trial court consolidated the Annexation action (case No. 12CECG03223) and the NKSP action (case No. 13CECG02139) for purposes of oral argument and trial only.

### B.    Motion to Augment

Before trial, Selma moved to augment the Annexation action's record of proceedings with documents from (1) the LAFCo action's record of proceedings; (2) the NKSP action's record of proceedings and (3) the draft EIR for the Selma Crossings project.  The trial court denied Selma's motion to augment and a subsequent motion to reconsider.  The motion and its ruling are discussed further below.

---

[7]Though called a *general* plan amendment, its effect was to repeal part VI of the North Kingsburg *Specific* Plan.

9.

### C. Trial and Ruling

The "trial" was held on November 7, 2014, and consisted solely of oral argument with citations to the administrative record.

After trial, the court denied Selma's petitions for a writ of mandate in both the Annexation and NKSP actions. The court held Selma failed to cite substantial evidence in support of its claims regarding agricultural, water quality, fire protection, traffic and air quality impacts. The court determined Selma had raised "only speculation and unsubstantiated opinion."

The court further concluded that Selma's submission of the draft EIR for the Selma Crossings project "without explanation of any alleged cumulative impacts … does not constitute a specific comment requiring a response." Finally, the court rejected Selma's contentions based on Water Code sections 10910-10915 because it did not raise the issue before the planning commission or city council.

The court did not offer a written explanation of its denial of Selma's writ petition in the NKSP action.

### STANDARD OF REVIEW

"In reviewing an agency's decision to adopt an MND, a court (whether at the trial or the appellate level) must determine whether there is substantial evidence in the record to support a 'fair argument' that a proposed project may have a significant effect on the environment. [Citation.] The fair argument standard creates a 'low threshold' for requiring an EIR, reflecting a legislative preference for resolving doubts in favor of environmental review. [Citation.]

"Whether the evidence establishes a fair argument that a project may result in significant environmental impacts is a question of law. [Citation.] Evidence supporting a fair argument may consist of facts, reasonable assumptions based on fact, or expert opinions supported by fact but not 'argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the environment.' [Citations.]

10.

"If substantial evidence exists to support a fair argument that a significant environmental effect may result from the project, the agency is required to prepare an EIR, irrespective of whether there is other substantial evidence in the record to the contrary. [Citations.]" (*Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 575-576.)

**DISCUSSION**

## I. Motion to Augment

### A. Procedural Background

Before trial, Selma filed a motion to augment the record in the Annexation action. Selma's notice of motion indicated it was seeking to have the following documents added to the administrative record: "a copy of the Draft Environmental Impact Report on the 'Selma Crossings' Project … and … all documents included in the record of the proceedings, on file in [the NKSP action] and the record of proceedings on file in [the LAFCo action]." In the notice of motion, Selma indicated the augmentation was being sought on "the ground that each and all of the documents referred to are required to be a part of the administrative record in this proceeding pursuant to the provisions of … § 21167.6 in that these are written materials that are relevant to the public agency's compliance with CEQA in connection with the project that is the subject of the petition for mandate. (See … §21167.6(e)(10)." Selma also requested "[i]n addition, or in the alternative" that the court take judicial notice of the documents under Evidence Code section 452, subdivision (d).

The trial court denied Selma's motion, concluding Selma had "made no showing in its motion as to why the [draft EIR] of an unrelated project should be part of the administrative record concerning *this* project." The court also observed:

"Nor can the Court judicially notice evidence not contained in the administrative record. For whatever reason, Selma has chosen to file multiple CEQA actions concerning the same project, but this does not necessarily transform what would be the administrative record in one case to something judicially-noticeable in another case. (Code Civ. Proc., § 1094.5.)"

11.

Selma filed a motion urging the trial court to reconsider its ruling. Selma argued the records of the proceedings in the NKSP and LAFCo actions were required to be included in the Annexation action's record of proceedings because they were written materials relevant to CEQA compliance issues or the merits of the project. (See § 21167.6, subd. (e)(10).) Selma acknowledged it was not possible to evaluate whether the documents met that standard "considering the full factual and legal basis for the assertion of relevance, which, in turn, requires an evaluation of the claims being made on the merits." As a result, Selma acknowledged it had mistakenly failed to ensure the trial court hear the motion to augment concurrently with the merits of the Annexation action. Selma asked the trial court to reconsider its prior ruling and requested relief under Code of Civil Procedure section 473, subdivision (b).

The trial court denied Selma's motion for reconsideration. The court observed Selma's original motion to augment "did not state what documents … Selma sought to have added to the record except, at best, the draft environmental impact report from a project called Selma Crossings, LLC." That is, "the original motion to augment did not state within its four corners what … Selma sought to add to the record and why."[8] The court also denied Selma's request for relief under Code of Civil Procedure section 473.

## B.     Law

After a CEQA action is filed, a record of proceedings must be certified and lodged with the court. (§ 21167.6, subds. (a)-(b).) Under section 21167.6, the record of proceedings must include certain specific items like project applications and staff reports, as well as other, broader categories of items. (E.g., § 21167.6, subd. (e)(1)-(2), (7), (10).)

---

[8]The court did not cite this ground in its written ruling on the initial motion to augment. Kingsburg repeats this assertion in its brief. We find it inaccurate. Selma's notice of motion clearly identified the documents it sought to add to the record: "a copy of the Draft Environmental Impact Report on the 'Selma Crossings' Project … and … all documents included in the record of the proceedings, on file in [the NKSP action] and the record of proceedings on file in [the LAFCo action]."

12.

By its terms, the statute "contemplates that the administrative record will include pretty much everything that ever came near a proposed development *or* to the agency's compliance with CEQA in responding to that development." (*County of Orange v. Superior Court* (2003) 113 Cal.App.4th 1, 8.)

Perhaps the broadest category of required items is subdivision (e)(10) of section 21167.6 requiring inclusion of the following:

> "(10) Any other written materials relevant to the respondent public agency's compliance with this division or to its decision on the merits of the project, including the initial study, any drafts of any environmental document, or portions thereof, that have been released for public review, and copies of studies or other documents relied upon in any environmental document prepared for the project and either made available to the public during the public review period or included in the respondent public agency's files on the project, and all internal agency communications, including staff notes and memoranda related to the project or to compliance with this division."

Subdivision (e)(10) of section 21167.6 was the basis for Selma's motion to augment the record of proceedings with the Selma Crossings draft EIR and the records of proceedings from the LAFCo and NKSP actions.[9]

### C. Analysis

#### 1. Kingsburg's Procedural Contentions Confuse the Administrative and Appellate Records

Kingsburg argues Selma's motion to augment the administrative record in the trial court did not comply with California Rules of Court, rule 8.155.[10] That rule provides a party may move to augment the appellate record, provided the party "attach to [the] motion a copy, if available, of any document or transcript that it wants added to the

---

[9]In the alternative, Selma requested the court take judicial notice of the documents. Selma posited that the two records of proceedings were noticeable under Evidence Code section 452, subdivision (d) and the draft EIR was noticeable under Evidence Code section 452, subdivision (h). The trial court denied Selma's request for judicial notice.

[10]Further rule references are to the California Rules of Court.

record." (Rule 8.155(a)(2).) Kingsburg contends that because Selma's motion did not attach the documents for which augmentation was being sought, they "are not part of the record of proceedings in either the Annexation Action or the NKSP Action."

Kingsburg also asserts the documents were not "specifically proffered as evidence, admitted, refused or lodged in the Annexation Action and, thus, are not part of the trial Court's record as required by Rule 8.124." Kingsburg cites *Vons Companies*, *Inc. v. Seabest Foods*, *Inc.* (1996) 14 Cal.4th 434, 444 in positing "augmentation procedures cannot be used to include or add documents from outside the Superior Court records of the Annexation Action, especially those not offered, lodged or otherwise before the trial court."

Kingsburg's contentions confuse the administrative and appellate records. "Care must be taken to distinguish the administrative record (i.e., the 'record of proceedings') from the record on appeal (see … rule 8.120 et seq.)." (*Madera Oversight Coalition*, *Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 61, fn. 4, disapproved on another point by *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 457.) Rules 8.124, 8.155, and the *Vons Companies*, *Inc.*, citation concern augmentation of the *appellate* record. But the documents in question are already part of the appellate record. (See fn. 5, *ante*.) The question is whether they were properly excluded from the *administrative* record (i.e., the record of proceedings). These authorities cited by Kingsburg have no bearing on that issue.

### 2. *That Two Records of Proceedings Concern the Same Project Is Not Dispositive as to Whether Documents from One Should Be Included in, or Excluded from, the Other Action's Record of Proceedings*

The trial court reasoned "Selma has chosen to file multiple CEQA actions concerning the same project, but this does not necessarily transform what would be the administrative record in one case to something judicially-noticeable in another case." We agree the record of proceedings in one case should not necessarily be included in the

14.

record of proceedings in another case *merely* because they involve the same project.  But neither should it be *excluded* for that reason.  The trial court's premise, though accurate, does not resolve the question of whether the LAFCo and NKSP documents should have been included in the Annexation action's record of proceedings under section 21167.6, subdivision (e)(10).

### 3. Written Materials Relevant to the Agency's Compliance with CEQA Must Be Included in the Record of Proceedings Even if Prepared after Project Approval

Kingsburg argues the documents were properly excluded because they "were not before the decision making body at the time of the approval of the Annexation."  We conclude that fact is not dispositive.  Section 21167.6 does not contain a blanket exclusion of all documents that were not presented to the decision-making body before project approval.  Of course, the vast majority of categories set forth in section 21167.6, subdivision (e) necessarily include only such documents.  (E.g., § 21167.6, subd. (e)(1) & (4).)

But not every category of items under subdivision (e) of section 21167.6 necessarily includes only documents prepared before project approval.  With some of its broader categories, the administrative record statute "seeks to include materials not only relating to the 'project,' but also relating to 'compliance' with CEQA.  … Compliance necessarily envisions a review process that transcends the finished 'project.'"  (*County of Orange v. Superior Court*, *supra*, 113 Cal.App.4th at p. 10.)  Subdivision (e)(10) is one such category, because it encompasses "[a]ny other written materials relevant to the respondent public agency's compliance with [CEQA] …."  (§ 21167.6, subd. (e)(10).)  And, in certain limited circumstances, documents prepared after project approval can be relevant to the issue of whether the agency complied with CEQA prior to, and at the time of, project approval.  For example, imagine a situation where an agency prepared a negative declaration for an annexation project based on its asserted conclusion the

15.

annexation would not lead to development. Then, after project approval, the agency created a document clearly indicating, in fact, the annexation was the first step in a specific development project planned before the annexation project was approved. Even though the document was created after project approval, it would be relevant to the scope of the *true* project and, therefore, "relevant to the … public agency's compliance with [CEQA]" (§ 21167.6, subd. (e)(10)) at the time of project approval.

We emphasize that even with our conclusion outlined above, documents created after project approval will rarely be included in a record of proceedings. As we observed before, most of the categories in subdivision (e) of section 21167.6 necessarily include only documents prepared before project approval. And even the clause in subdivision (e)(10) of section 21167.6 contains a specific relevance limitation (i.e., the written materials must be "relevant to the respondent public agency's compliance" with CEQA). This limitation will often have the effect of excluding documents prepared after project approval. Consider a hypothetical where an agency approves a project, and no future discretionary approvals are required. Thereafter, an expert conducts a study illuminating a novel, previously unknown environmental impact the project will likely have. In that circumstance, because the project has already been approved, the agency is not required to reopen the approval. (CEQA Guidelines, § 15162, subd. (c).) Consequently, the expert's postapproval study would not be "relevant to the … public agency's compliance with [CEQA] …." (§ 21167.6, subd. (e)(10.)

### D. Conclusion

Below we analyze Selma's substantive CEQA challenges. As that analysis will demonstrate, some of the documents from the LAFCo action's record of proceedings are "relevant to the … public agency's compliance with [CEQA]" (§ 21167.6, subd. (e)(10)) with respect to issues raised in the Annexation action. Consequently, those documents

should have been included in the Annexation action's record of proceedings upon Selma's request, and we will consider them in analyzing the issues in this appeal.

## II. Water Supply Analysis

### A. Background

#### 1. The MND

In a section concerning water facilities, the MND contains the following analysis:

"Water supplies within the area between the State Route 99 freeway and Golden State Boulevard will be provided by … Kingsburg. A 12-inch water main has already been extended in the western shoulder of Golden State Boulevard from the existing city limits to Amber Avenue capable of serving the entire area between the State Route 99 freeway and the railroad. Each property owner will be responsible for the cost of new service connections, including infrastructure improvements and the completion of a loop (tie-in) with a minimum eight-inch (8") connection between the water main and a development project.

"The industries east of the Union Pacific Railroad already provide for their own water supplies. The Vie-Del grape processing plant, Sun-Maid raisin plant and Guardian Industries glass plant each has two on-site water wells producing adequate supplies of high-quality water. The small triangular parcel fronting on Mountain View Avenue just east of the railroad tracks is also served by an on-site well. Eventually [Kingsburg] may provide water service to these properties at the request of the owners."

#### 2. Information from LAFCo Action's Record of Proceedings

However, Kingsburg's Service Plan for the Annexation Territory submitted to LAFCo indicated:

"Currently, the three industries that occupy all of the parcels within the subject territory have their own water systems. The Guardian Industries glass plant, Vie-Del grape processing facility and Sun-Maid Growers raisin plant each have two on-site water wells. Through an extra-territorial agreement with George and Lousie [*sic*] Alves, dba G & L Enterprises, 13281 Golden State Boulevard, to extend a water main from Kamm Avenue to Amber Lane [*sic*]. *Once the annexation has been approved* ownership of the water main *will transfer* to [Kingsburg] and be made available for connection to *all adjoining properties*." (Italics added.)

17.

A LAFCo report dated April 10, 2013, repeats information similar to the Service Plan:

> "Currently, the three industries have their own water systems. A water main *will be* extended from Kamm Avenue to Amber Lane. Once the annexation has been approved, ownership of the water main *will transfer* to [Kingsburg] and *be made* available for connection to all adjoining properties." (Italics added.)

In an e-mail dated July 8, 2013, Kingsburg's contracted city engineer provided city staff with information concerning the water main. He explained the plans for the water line were prepared by Kingsburg in 2008 and the water line had been in operation without water supply issues since 2009. He also indicated the water line was supplied by three of Kingsburg's municipal wells. Finally, he indicated the impacts of pumping groundwater from municipal wells were being addressed pursuant to an agreement between Kingsburg and the Consolidated Irrigation District, which provided for a recharge program.

A LAFCo report dated July 17, 2013, corrected the April 10, 2013, report's description of the water supply as follows:

> "Currently, the three industries have their own water systems. A water main *has been* extended from Kamm Avenue to Amber Lane. The waterline is *currently owned and operated* by … Kingsburg and *is* available for connection to *all* adjoining properties. Water is supplied through … Kingsburg municipal wells. Industry wells do not and will not connect to the waterline. The pumping of groundwater from [Kingsburg] wells and the associated impact to groundwater has been addressed through the existing agreement between … Kingsburg and [the] Consolidated Irrigation District. This agreement provides a groundwater recharge program to offset groundwater pumping by … Kingsburg wells." (Italics added.)

**B.      Analysis**

Selma challenges the accuracy and sufficiency of Kingsburg's water supply analysis. First, Selma argues Kingsburg misrepresented the scope of the project by failing to disclose a plan to extend or install water infrastructure to serve the existing

18.

industries after the annexation was approved.  Kingsburg counters that a water main was already in place and there was "no plan for development of a new watermain." Kingsburg points to the portion of the MND quoted above stating:  "A 12-inch water main has already been extended in the western shoulder of Golden State Boulevard from the existing city limits to Amber Avenue …."  In response, Selma argues the 12-inch water main referenced in this excerpt "is not the same water line that needs to be extended to serve … the 'existing industries' …."

### C. Selma Has Failed to Carry Its Burden in Showing Kingsburg Concealed a Plan to Install Undisclosed Water Supply Infrastructure

#### 1. The MND Water Facilities Analysis Is Not Conclusive

The cited language from the MND does not support Selma's contention the MND "shows on its face that the 12 inch line has been extended to serve an area that does not include the location of the 'existing industries.'"  While the MND does clearly indicate the 12-inch main was extended and is capable of serving properties *west* of the railroad, it does not say the same 12-inch main cannot also be used to serve the existing industries east of the railroad once appropriate connections are made.  In other words, nothing in the MND suggests the 12-inch line was not extended to serve both the properties west of the railroad and, eventually, the existing industries east of the railroad.  To the contrary, the MND clearly indicates the properties east of the railroad may connect to city water at their initiation.  More importantly, the MND does not expressly contemplate the construction of any additional water mains apart from the 12-inch line (and connections to it).

Of course, neither does the MND language expressly establish Kingsburg's position that "[t]here is no plan for development of a new watermain for the Annexation Territory."  That is, the MND does not explicitly state there are no plans to construct a new water main.  However, since Selma is the party contending Kingsburg harbored an undisclosed plan to extend or install a separate water main, it bears the burden of pointing

19.

to evidence supporting that claim. The MND's water facilities analysis does not suffice to support Selma's claim because it does not indicate, on its face, that there is an undisclosed plan to extend or install a separate water main for the existing industries.

We now consider Selma's contentions such evidence exists elsewhere.

### 2. Selma's Citation to the Service Plan Does Not Show Kingsburg Planned Expansion or Installation of a Separate Water Main to Serve the Existing Industries

Selma points to the Service Plan in the LAFCo action's record of proceedings to support its claim the 12-inch water main referenced in the MND must be different from the one planned to service the existing industries. Selma contends the Service Plan indicates the water main for the existing industries will extend "from Kamm and Amber Lane" whereas the 12-inch main referenced in the MND goes *to* Amber Lane. However, the Service Plan actually says the water main for the existing industries would extend from Kamm *to* Amber Lane, not "from Kamm and Amber Lane" as Selma indicates. Correctly stated, the Service Plan's description does not materially differ from the MND's description of the 12-inch water main as having been extended "in the western shoulder of Golden State Boulevard from the existing city limits *to* Amber Avenue." (Italics added.) There is no irreconcilable inconsistency between these two descriptions and therefore no indication they pertain to two different water mains.

### D. Adequacy of Water Supply Analysis

Selma next argues that even if Kingsburg did not misrepresent the scope of the project with respect to the provision of water to the existing industries, it was nonetheless "required to carefully evaluate the impact to City water supplies of serving the existing industries" and did not do so. Specifically, Selma contends Kingsburg "failed, to identify any public water supply available to supply water to the annexed territory."

In arguing Kingsburg was required to analyze water supply issues in more detail, Selma cites cases such as *Vineyard Area Citizens for Responsible Growth, Inc. v. City of*

20.

*Rancho Cordova* (2007) 40 Cal.4th 412, 432-434, *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 283-284, and *Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 829-831.  However, all of those cases concerned the level of water supply analysis required in an EIR, not an initial study.  "An initial study is only a 'preliminary analysis' [citation] and the regulatory requirements regarding its contents are not as demanding as those imposed upon an EIR.  [Citations.]  '[A]n initial study is neither intended nor required to include the level of detail included in an EIR.'  [Citation.]"  (*Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1192.)

Selma fails to appreciate that "'the ultimate issue is not the validity of the initial study, but rather the validity of the lead agency's adoption of a negative declaration.  Even if the initial study fails to cite evidentiary support for its findings, "it remains the appellant's burden to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact."  [Citation.]  "An absence of evidence in the record on a particular issue does not automatically invalidate a negative declaration.  'The lack of study is hardly evidence that there *will* be a significant impact.'"'"  (*Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 725.)

Accordingly, we reject Selma's claim concerning water supply analysis in the initial study.  It is not enough to "complain[] about supposed deficiencies in the water supply assessment" without showing the record contains substantial evidence supporting a fair argument the project may have a significant impact notwithstanding the agency's conclusion to the contrary.  (*Rominger v. County of Colusa*, *supra*, 229 Cal.App.4th at p. 729.)  In other words, claiming there are holes in the environmental analysis is not the same as affirmatively showing there is evidence supporting a fair argument a project may cause significant environmental effects.

21.

Moreover, we note the record does contain evidence concerning how water would be supplied to the existing industries should they decide to connect. The Service Plan described a water line extended by G & L Enterprises and observed the line will be made available for connection after annexation. In a correspondence appearing in the LAFCo action's record of proceedings, Kingsburg's contracted city engineer notes the water line itself is supplied by three municipal wells. And the MND states that groundwater supply in the area is "ample" and a "future municipal well is planned near the northwestern end of the annexation …." The MND also notes that, pursuant to an agreement with the irrigation district, Kingsburg "is mitigating groundwater overdraft in the City … by instituting a process as identified in the … agreement, for the payment of contributions into a groundwater management and replenishment fund for the purpose of implementing groundwater replenishment methodologies …."

In sum, these documents indicate that should the existing industries decide to connect to the line constructed by G & L Enterprises, they will be supplied by municipal wells, and measures are being taken to mitigate overdraft of Kingsburg's wells. It is not enough to simply assert this analysis was insufficient; Selma needed to point to substantial evidence supporting a fair argument that significant environmental impacts may result if the existing industries decide to connect to Kingsburg's water. It did not do so.

### E. Selma Failed to Raise Alleged Violations of the Water Code in Accordance with Section 21177

Selma also contends Kingsburg violated several Water Code provisions concerning water supply analysis for CEQA projects. (See Wat. Code, §§ 10910-10915.) Kingsburg argues Selma failed to exhaust its administrative remedies on this issue by failing to raise it before or during the close of the public hearing. (See § 21177.)

Section 21177, subdivision (a) provides "[a]n action or proceeding shall not be brought … unless the alleged grounds for noncompliance with [CEQA] were presented to

22.

the public agency orally or in writing by any person during the public comment period provided by [CEQA] or prior to the close of the public hearing on the project before the issuance of the notice of determination."

The exhaustion statute does not apply "if the public agency failed to give the notice required by law." (§ 21177, subd. (e).)

Selma responds section 21177, subdivision (a) does not apply because the project description was so misleading in its failure to properly describe the planned water infrastructure that it amounted to a complete lack of notice. Since we concluded the project description was not misleading in this respect (see DISCUSSION, pt. II.A, *ante*), we reject Selma's argument concerning inadequate notice and find this issue was forfeited by a failure to exhaust administrative remedies.

## III. Fire Protection

### A. Background

The MND indicated the Annexation Territory would be served by Kingsburg's Fire Department (KFD). The MND further indicated it had been determined the KFD "has sufficient service capability to meet the fire and emergency response needs of the area."

According to Kingsburg's July 2012 Service Plan, the Annexation Territory was then being served by the Fresno County Fire Protection District (FCFPD) from Station 83, with supplemental protection from several agencies including KFD. FCFPD's Station 83 is directly across from the Guardian glass plant on Mountain View Avenue.

A staff report authored by Mata and dated August 15, 2012, notes Kingsburg had previously entered into a Transition Agreement with FCFPD "wherein the City agree[d] to transfer certain taxes revenues to the District for each annexation covered by the Transition Agreement." The report observed the term of the Transition Agreement would

23.

end on December 31, 2012, and that Kingsburg was engaged in "negotiations with the [FCFPD] in hopes of agreeing upon the terms of a new Transition Agreement."

At the September 5, 2012, public hearing, KFD Chief Tim Ray addressed the city council. Chief Ray indicated Kingsburg currently had an automatic aid agreement with Fresno County. Under the terms of that agreement, both KFD and FCFPD are simultaneously dispatched to certain calls and "it's basically a race to whoever gets there first." Due to its proximity to the plant, FCFPD's Station 83 would often respond more quickly to the Guardian plant than KFD could. KFD, however, is closer to Sun-Maid Growers of California raisin plant.

Chief Ray acknowledged there was uncertainty as to whether Fresno County would renew its automatic aid agreement with Kingsburg. However, Chief Ray indicated that in addition to the automatic aid agreements with Fresno and Tulare Counties, there are also "mutual aid agreements" in effect. Chief Ray opined that whether the automatic aid agreement would be renewed is "immaterial" because the "mutual aid agreement" would remain in effect. He also stated there is a "State of California Blanket Mutual Aid,"[11] which "basically in layman terms says that if I ask you to come and you are available, you will come. So, that includes everybody in this entire area."

Chief Ray concluded that "regardless of whose area [i.e., the Annexation Territory] that actually is, I don't believe that our response to that area is going to be any different whether its Fresno County's or if it's the City of Kingsburg. We both have an engine that's staffed." Chief Ray acknowledged that large fires could require additional resources, but that would also be true if FCFPD were responding. Chief Ray opined, "In my opinion, I don't see this annexation changing the fire response in any way."

___

[11]Unfortunately, the parties' briefing fails to discuss Chief Ray's reference to the "State of California Blanket Mutual Aid." Chief Ray may have been referring to the California Disaster and Civil Defense Master Mutual Aid Agreement created to facilitate the implementation of the California Emergency Services Act (Gov. Code, § 8550 et seq.). (See Gov. Code, § 8561.)

24.

The MND Addendum, apparently created sometime in 2013, indicated the Transition Agreement between Kingsburg and FCFPD had expired. The Addendum states the expiration of the transition agreement "will not result in new or increased impacts to fire protection services upon approval of the annexation as the agreement only addressed financial considerations." It then notes the "Kingsburg Fire Department has sufficient capacity to service the proposed annexation area with both fire and emergency services."

During the subsequent LAFCo approval process, FCFPD opposed Kingsburg's annexation of the Annexation Territory. In a March 28, 2013, letter to LAFCo, the FCFPD explained it receives funding primarily through taxes levied on all property within its boundaries. The FCFPD claimed that over the last 10 years, city annexations had resulted in a funding loss of $5.5 million in property tax revenue. With respect to this project, detaching the Annexation Territory from the FCFPD would cause the FCFPD to lose $101,302 in annual funding. This would "equate[] to" a loss of two full time paid firefighter positions at Station 83. This placed the station "at risk of being closed," which would "result in reduced emergency services to the Guardian Glass, Sun Maid Raisin, and Vydell [*sic*] Winery facilities, an overall reduction in services throughout the Fire District, as well as less support to the Cities …."

The March 28, 2013, letter indicated LAFCo's existing policies required cities seeking annexation to have a transition agreement in place before an annexation would be approved. The letter encouraged LAFCo not to change that policy. The letter also indicated FCFPD had offered "several transition agreement options" to Kingsburg, but they were all refused. The letter closed by claiming Kingsburg did not have the ability to provide "the appropriate level of emergency services to protect the people that work within the Guardian Glass and SunMaid facilities."

25.

**B.	Analysis**

Selma contends Kingsburg did not adequately study its "ability to provide fire service from, or without, Station 83 which depended on whether a Transition Agreement was in place."

### 1.	Selma's Contentions Contain Several Inaccurate Factual Assertions

In its arguments on the fire protection issue, Selma misconstrues the record in several respects.  First, Selma states the Addendum "states expiration of the transition/*mutual aid* agreements did not impact Kingsburg's ability to respond to emergency calls, contrary to the Fire Chief's testimony and [FCFPD]'s submissions to LAFCO."  (Italics added.)  However, the Addendum only refers to expiration of the Transition Agreement, not any mutual aid agreements.

Selma also claims Chief Ray testified Kingsburg could not provide services without station 83.  It offers no citation to the record in support of this assertion.  To the contrary, Chief Ray said it would not matter whether KFD or FCFPD responded to the annexation territory because both agencies "have an engine that's staffed."

### 2.	The Record Does Not Support Selma's Contention that Chief Ray Was Merely Speculating When He Testified He Believed FCFPD Would Continue to Respond to Fires in the Annexation Territory

Selma contends Chief Ray was "essentially speculating" that the expiration of the transition agreement would not cause FCFPD "to cease to provide fire services from Station 83."  We disagree.

Chief Ray articulated specific reasons for his belief FCFPD would continue to provide services.  Chief Ray observed that whether the automatic aid agreement with FCFPD would be renewed was "immaterial" because the "mutual aid agreement" would remain in effect.  He also stated there is a policy called "State of California Blanket

Mutual Aid," which "basically in layman terms says that if I ask you to come and you are available, you will come." This policy applied to "everybody in this entire area."

More fundamentally, however, Selma's focus on Station 83 seems misplaced. Even if we accepted Selma's assertion the expiration of the Transition Agreement meant FCFPD would no longer respond to fires in the Annexation Territory, we fail to see how this undermines the MND. The MND said the Annexation Territory would be served by KFD, which was determined to have "sufficient service capability to meet the fire and emergency response needs of the area." Another way of phrasing the MND's analysis is that even without FCFPD's help, KFD could provide a sufficient level of fire protection services such that no significant impact to the environment would occur. This conclusion is supported by Chief Ray's testimony the fire response to the Annexation Territory would be the same whether KFD or FCFPD was responding because both agencies had "an engine that's staffed." To contradict the MND on this point, Selma needed to do more than raise a fair argument KFD would no longer have FCFPD's help going forward. Selma needed to raise a fair argument that without FCFPD's responding to fires in the Annexation Territory, the project may cause significant impacts to the environment. In other words, Selma needed to point to evidence the purported decrease in fire protection was substantial enough to potentially cause significant environmental impacts. Selma has not done so.

## IV. Various Procedural Claims

### A. Combined Initial Study and MND

Selma contends the failure to prepare an initial study *before* the MND is a failure to comply with CEQA. It cites *Lighthouse Field Beach Rescue v. City of Santa Cruz*, *supra*, 131 Cal.App.4th at pages 1192-1193 in support of this contention, but that authority simply does not discuss the issue. Selma has not carried its burden.

**B. Purported Failure to Consult with LAFCo**

Selma argues Kingsburg failed to informally consult with LAFCo prior to the adoption of the MND. Selma does not support this factual claim with any citation to the record and we consider it forfeited. (See *North Coast Rivers Alliance v. Kawamura* (2015) 243 Cal.App.4th 647, 677-678.)

**C. Subsequent EIR/Negative Declaration**

Selma argues the repeal of the design standards in the NKSP "eliminates mitigation measures from the MND and, therefore, makes a significant change to the MND." But even if we accept Selma's interpretation that repealing the design standards effectively removed a mitigation measure from the annexation project's MND, Selma has failed to show how that change met the substantiality requirements of CEQA Guidelines section 15162. Not all new information or changes to a project (or its circumstances) trigger the need for new CEQA analysis. (See CEQA Guidelines, § 15162, subd. (a).) The change or new information must somehow involve a new *significant* environmental effect, *substantially* increase the severity of previously identified effects, or show a mitigation measure would *substantially* reduce one or more significant effects. (CEQA Guidelines, § 15162, subd. (a)(1)-(3).) Selma has not explained how changes to the NKSP meet this substantiality requirement.

**D. Propriety of the Addendum**

Selma argues Kingsburg violated CEQA's procedural requirements when it issued a purported Addendum to the MND.

*1. The Addendum Is in the Administrative Record*

Preliminarily, Kingsburg claims the Addendum is outside the administrative record. This assertion is incorrect; the Addendum can be found in the Annexation action's record of proceedings at pages K0026-K0027.

### 2. An Addendum Was an Appropriate Means for Addressing the Expiration of the Transition Agreement

Selma argues the Addendum was inappropriate because it involved more than a minor or technical change.

An agency may prepare an addendum to a negative declaration "if only minor technical changes or additions are necessary or none of the conditions described in [Guidelines] Section 15162 calling for the preparation of a subsequent … negative declaration have occurred." (CEQA Guidelines, § 15164, subd. (b).)

CEQA Guidelines section 15162 lists three conditions necessitating a subsequent EIR or negative declaration, only two of which are conceivably relevant here.[12] (CEQA Guidelines, § 15162, subds. (a)(1)-(3).)

First, a subsequent negative declaration must be prepared when there is a substantial change in "circumstances under which the project is undertaken which will require major revisions of the previous … negative declaration due to the involvement of new significant, environmental effects or a substantial increase in the severity of previously identified significant effects." (CEQA Guidelines, § 15162, subd. (a)(2).)

Here, the "change" in circumstance was the expiration of the Transition Agreement concerning fire protection. However, the original MND indicated Kingsburg, not the FCFPD, would be providing fire protection to the Annexation Territory. The Addendum did not change this fact and indicated the expiration of the Transition Agreement would not "result in new … impacts to fire protection services" because the Transition Agreement concerned only financial considerations. Thus, the expiration of the Transition Agreement did not effect a "substantial change[]" to the circumstances under which the Annexation project was being undertaken, nor did it involve "new

---

[12]Subdivision (a)(1) of CEQA Guidelines section 15162 applies when certain changes to *the project* are proposed. Here, there was a change in circumstance (i.e., the expiration of the Transition Agreement concerning emergency services), not a change in the project itself.

significant, environmental effects or a substantial increase in the severity of previously identified significant effects." (CEQA Guidelines, § 15162, subd. (a)(2).)

Second, a subsequent negative declaration must be prepared when certain "[n]ew information of substantial importance, *which was not known and could not have been known* with the exercise of reasonable diligence at the time the previous … negative declaration was adopted" is discovered.[13] (CEQA Guidelines, § 15162, subd. (a)(3), italics added.) There is no indication that when it adopted the original negative declaration, Kingsburg did not know the Transition Agreement would expire on December 31, 2012. Indeed, the Transition Agreement itself clearly specified it would "automatically terminate no later than December 31, 2012, unless it has been terminated prior to that time …."

Since "none of the conditions described in [Guidelines] Section 15162 calling for the preparation of a subsequent … negative declaration … occurred" (CEQA Guidelines, § 15164, subd. (b)), Kingsburg was permitted to prepare an addendum to its negative declaration.

### 3. Kingsburg Failed to Consider the Addendum Prior to Project Approval in Violation of CEQA Regulations

The CEQA Guidelines require that "[t]he decision-making body shall consider the addendum with the final … adopted negative declaration prior to making a decision on

---

[13]The new information must show either: "(A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration; [¶] (B) Significant effects previously examined will be substantially more severe than shown in the previous EIR; [¶] (C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or [¶] (D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative." (CEQA Guidelines, § 15162, subd. (a)(3)(A)-(D).)

the project." (CEQA Guidelines, § 15164, subd. (d).)  Selma cited this guideline in its opening briefs in the trial court and on appeal.  Kingsburg offers no response.

The Addendum indicates that after the MND was adopted, the Transition Agreement between Kingsburg and the FCFPD expired.  The Transition Agreement indicated it would end on December 31, 2012.  Thus, while the Addendum itself was undated, it was clearly completed sometime after Kingsburg approved the annexation project in 2012.  This chronology violates the CEQA Guidelines.  (See CEQA Guidelines, § 15164, subd. (d).)

Selma insists the Addendum is a "nullity."  We agree only insofar as the Addendum cannot be a basis for determining Kingsburg satisfied CEQA.  But that conclusion does not get Selma very far.  Even without the Addendum, the original MND indicated KFD will be providing fire services to the Annexation Territory, and the Addendum did not change that.  It would be a different case if Kingsburg were relying on the Addendum as an essential aspect of its CEQA compliance.  But that is not the situation here.  Even if we were to completely ignore the Addendum, it remains Selma's burden to point to substantial evidence to support a fair argument the changes to fire protection may cause a significant environmental impact.  As explained above (see DISCUSSION, pt. III, *ante*), it has not met that burden.

### 4. *The Addendum Did Not Violate CEQA Guidelines Section 15164, Subdivision (e)*

Selma contends the Addendum also violated CEQA Guidelines by failing to include "[a] brief explanation of the decision not to prepare a subsequent EIR pursuant to [Guidelines] Section 15162." (CEQA Guidelines, § 15164, subd. (e).)  We disagree.

First, we note CEQA Guidelines section 15164, subdivision (e) indicates only that an addendum "should" contain such an explanation.  Second, the Addendum *did* provide a brief explanation of the decision not to prepare a subsequent EIR:

31.

"In preparing this Addendum, all of the potential impacts identified on the CEQA 'Environmental Checklist' were considered. For all impact areas, staff's review indicated that the expiration of the fire transition agreement would not result in physical changes on the property or changes to the project that would change the environmental analysis. Public Services and other environmental conditions have not changed significantly since the Guardian/Sun-Maid Reorganization Mitigated Negative Declaration was adopted on August 15, 2012. Therefore, the project would have no new impact(s) not already identified in the Guardian/Sun-Maid Reorganization Mitigated Negative Declaration, nor would it result in a substantial increase in the severity of previously identified impacts. In summary, the analysis concludes that none of the conditions described in Section 15162 of the CEQA Guidelines calling for preparation of a subsequent EIR or Negative Declaration have occurred, and thus an Addendum to the Guardian/Sun-Maid reorganization Mitigated Negative Declaration is appropriate to satisfy CEQA requirements for the proposed project."

Consequently, we conclude Kingsburg did not run afoul of the Guidelines' requirement an addendum contain a "brief explanation of the decision not to prepare a subsequent EIR pursuant to [Guidelines] Section 15162 …." (CEQA Guidelines, § 15164, subd. (e).)

## V. Selma Fails to Carry Its Burden of Raising a Fair Argument that Potential Modification or Expansion of Guardian's Plant Would Be a Direct or Indirect Effect of the Project

Selma asserts the MND does not properly study the possibility of facility modifications at the Guardian property and potential resultant impacts on agricultural land, etc.[14]

An initial study is required to analyze direct and indirect effects of the project. "A direct physical change in the environment is a physical change in the environment which is caused by and immediately related to the project." (CEQA Guidelines, § 15064, subd. (d)(1).) "An indirect physical change in the environment is a physical change in the environment which is not immediately related to the project, but which is caused

---

[14] The MND observed Guardian owns a 15-acre vineyard in the Annexation Territory. The MND states it is "anticipated it will be used for future expansion."

indirectly by the project." (CEQA Guidelines, § 15064, subd. (d)(2).) Thus, in order to be a direct or indirect effect of a project, the future physical change in the environment must have a causal link to the project.

Selma does not point to substantial evidence supporting a fair argument a future modification of the Guardian plant would be an "effect" of the project at all. To the contrary, the evidence strongly indicates that if Guardian ultimately expanded its plant, it would not be doing so as a result of the annexation project.

First, Guardian initially opposed the annexation because it might hinder its ability to modify its facilities. This obviously undermines the suggestion that modification of the Guardian facilities would be an "effect of" the annexation.[15]

Second, Guardian's April 10, 2013, letter to LAFCo expressly discusses why it would possibly modify its facility in the future:

> "While Guardian has not proposed any specific project on the Guardian Property, to remain competitive in the glass manufacturing business, Guardian from time to time is required to perform modifications to its facility, which usually requires discretionary permits from the applicable local agency."

Thus, the evidence shows future changes to the Guardian property would be driven by business considerations.

---

[15]At oral argument, Selma's counsel indicated the anticipated modifications would require rezoning of a 15-acre parcel owned by Guardian, and the annexation project accomplished such a rezoning. Counsel claimed that "if you look at the letters from Guardian that say 'we're going to expand' you can tell it's a big expansion and it's going to take up a lot of that previously agriculturally zoned land."

We reject this contention. Guardian's letters do not identify any specific planned use for the 15-acre parcel. Moreover, while Guardian's letters identify several impediments to potential future modifications—such as the NKSP design standards, etc.—they do *not* claim that *rezoning* of the 15-acre parcel is required to accommodate future plant modifications.

The MND's acknowledgment Guardian may modify or expand its facilities *after* annexation does not constitute substantial evidence supporting a fair argument such a modification or expansion would be the *result of* the annexation project.

## VI. Mitigation Measures 3.1 and 16.1 Do Not Improperly Defer Analysis of Potential Future Development Projects

### A. Background

The MND indicated certain traffic and air quality impacts would be less than significant with mitigation. With respect to traffic, the MND acknowledged: "Additional traffic loads will be generated by commercial and industrial development as individual development projects are proposed. Transportation related impacts will be addressed on a project by project basis, with resulting impacts mitigated through design or construction of new facilities and improvements." The MND adopted mitigation measure 16.1, which required that future development projects within the Annexation Territory would need to "analyze their project specific traffic impacts … and will be responsible for mitigating the project specific impacts." Mitigation measure 16.1 also provided that any proposed project "generat[ing] 100 or more trips per day shall be required to perform a traffic impact study to determine current levels of service and anticipated impacts of the project on adjacent roadways."

With respect to air quality impacts, the MND indicated the project itself would "not significantly increase the production of any criteria pollutant …." However, the MND acknowledged that future development "may contribute to criteria pollutants." Accordingly, the MND adopted mitigation measure 3.1, requiring "[a]ny future development will comply with appropriate policies or regulations of the San Joaquin Valley Unified Air Pollution Control District …, including, but not limited to Regulation VIII (Fugitive Dust Control) and Rule 9510 (Indirect Source Review)."

Selma contends these purported mitigation measures constitute improper deferral under *City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325 (*City of Antioch*).

## B.    Law

In *City of Antioch*, *supra*, 187 Cal.App.3d 1325, a developer sought a permit to construct a roadway and sewer system.  The sole purpose for the project was to spur further development.  (*Id.* at p. 1337.)  Nonetheless, the city argued a negative declaration was appropriate because "the project involves no building construction or introduction of new land uses and that at present it is not known what type of development will occur on the surrounding undeveloped land," and "proposals for future development will be subject to further environmental review at the time of development of the surrounding land."  (*Id.* at p. 1333.)

The court held an EIR was required.  The court refused to "look at the proposed project in a vacuum" and rejected assurances that "other phases of development of the entire property will be accorded appropriate environmental review in due course."  (*City of Antioch*, *supra*, 187 Cal.App.3d at p. 1334.)  The court summarized its reasoning as follows

> "In sum, our decision in this case arises out of the realization that the sole reason to construct the road and sewer project is to provide a catalyst for further development in the immediate area.  Because construction of the project could not easily be undone, and because achievement of its purpose would almost certainly have significant environmental impacts, construction should not be permitted to commence until such impacts are evaluated in the manner prescribed by CEQA."  (*City of Antioch*, *supra*, at pp. 1337-1338.)

*City of Antioch* did not create a bright-line rule.  The detail required in the analysis of potential future development continues to depend on a variety of factors.

> "[A]n agency cannot avoid the EIR process simply because a project does not itself call for the construction of housing or other facilities that will be needed to support the growth contemplated by the project.  It does not follow, however, that an EIR is required to make a detailed analysis of the impacts of a project on … growth.  Nothing in the Guidelines, or in the cases, requires more than a general analysis of projected growth.  The detail required in any particular case necessarily depends on a multitude of factors, including, but not limited to, the nature of the project, the directness

or indirectness of the contemplated impact and the ability to forecast the actual effects the project will have on the physical environment. In addition, it is relevant, although by no means determinative, that future effects will themselves require analysis under CEQA." (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 369.)

Here, we find several factors militate against the need for detailed environmental analysis of potential future development.

First, future development projects in the Annexation Territory will be subject to CEQA review. While this fact is not always determinative, it is a relevant consideration. (E.g., *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 228.)

In *City of Antioch*, the court essentially concluded that immediate environmental analysis of future development resulting from the project was appropriate because the location and design of the road and sewer would effectively commit the city to a certain development pattern for the future. This consideration, which was central to *City of Antioch*,[16] is not nearly as strong here. The present annexation project is a change in political boundaries. (See Gov. Code, § 56017.) This fact does not render any resultant development irrelevant (see *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 279-281), but it does distinguish this case from *City of Antioch*. An annexation does not irreversibly impact the range of future development options in the way that a roadway and sewer constructed in a specific location does. In other words, we are not yet at the proverbial fork in the road when it comes to future development. Consequently, permitting detailed environmental analysis to occur in connection with the specific development projects that may be proposed in the future—rather than requiring it now— is the preferable course.

---

[16]Indeed, *City of Antioch* itself distinguished *Brentwood Assn. for No Drilling*, *Inc. v. City of Los Angeles* (1982) 134 Cal.App.3d 491 because "[t]he size, location and configuration of the roadway and utilities will influence not only the fact but the nature of later development to a much greater degree than the [project] at issue in *Brentwood*." (*City of Antioch*, *supra*, 187 Cal.App.3d at p. 1335.)

Second, little is known of how future development will proceed in the Annexation Territory. This fact reduces both the utility and the feasibility of currently studying the potential environmental impacts of unspecified future development in detail. Environmental analysis need not "engage in sheer speculation as to future environmental consequences." (*Towards Responsibility in Planning v. City Council* (1988) 200 Cal.App.3d 671, 681.) It would be unreasonable to expect environmental analysis to include detailed information about the environmental impacts of future development "whose scope is uncertain and which will in any case be subject to its own environmental review." (*Ibid.*) Requiring detailed environmental analysis of "unspecified and uncertain development that might be approved in the future … would be speculative, wasteful, and of little value …. Far too little is known about the scope, the location, or the types of projects that might be proposed in the future to assist decision makers in evaluating any potential environmental tradeoffs. Thus, the amorphous nature of possible development … stands in stark contrast to the related projects ignored in … *City of Antioch*." (*Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1032.)

For the same reasons, we reject Selma's contention there is insufficient analysis of cumulative impacts resulting from the annexation project and the Selma Crossings project. The only potential cumulative significant impacts would be between the Selma Crossings project and any future development projects that may occur in the Annexation Territory. And that dynamic cannot be meaningfully studied at this juncture because it is unknown what type of development may occur in the Annexation Territory. Of course, when and if specific development projects in the Annexation Territory go through the CEQA process, it may be necessary, at that time, to analyze their potential cumulative effects in light of the Selma Crossings project.

Selma also cites CEQA Guidelines sections 15162-15163 and claims it was improper for the MND to rely on the NKSP EIR for evaluation of air quality impacts

without finding there is no change in circumstances. But those Guidelines require a subsequent EIR when changes to a project or its circumstances occur or new information becomes available *after* the adoption of the negative declaration. (See CEQA Guidelines, § 15162, subd. (b).) Otherwise, the lead agency may determine whether to prepare a subsequent negative declaration, an addendum, or no further documentation at all. (*Ibid*.) Selma does not explain how the failure to analyze changes between the adoption of the NKSP EIR and the adoption of the annexation project's MND is relevant under CEQA Guidelines sections 15162-15163, which concern changes *after* the adoption of the project's MND.

Selma argues that since the MND states net increases in pollutants are less than significant only with mitigation, and the MND failed to properly incorporate mitigation measures from a separate document, there is "necessarily" a fair argument of potential significant impacts. But this contention ignores that the MND indicated the only potential air quality impacts would come from future development projects, and those impacts would be mitigated by measures specific to the future development projects. In other words, the MND was not relying on the NKSP EIR's mitigation measures, but instead on mitigation measures that would be developed in conjunction with any future development projects. Requiring anything more would be to ask Kingsburg to "engage in sheer speculation as to future environmental consequences." (*Towards Responsibility in Planning v. City Council*, *supra*, 200 Cal.App.3d at p. 681.)

## VII. Purported "Mitigation Measure 16.2" Is Not a True Mitigation Measure

The MND also identifies mitigation measure 16.2 as follows:

"The City of Kingsburg intends to initiate the preparation of a traffic impact fee study for the purpose of analyzing the impacts of contemplated future development on City-wide traffic facilities along with an analysis of the need for new traffic facilities required by new development in the City, including new development in the project area. The traffic impact fee study will also identify the relationship between new development and the needed traffic facilities and will identify the estimated cost of the needed traffic

38.

facilities. Following the preparation of a traffic impact fee study, the City Council will consider the adoption of an ordinance amending the City traffic impact fees."

Selma argues this is not truly a mitigation measure. We agree.

"Mitigation" includes (1) avoiding an impact altogether by not taking a certain action or parts of an action; (2) minimizing impacts by limiting the magnitude of the action; (3) rectifying the impact by restoring the impacted environment; (4) reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; and (5) compensating for the impact by replacing or substituting resources or environments. (CEQA Guidelines, § 15370.)

Generally, "it is inappropriate to postpone the formulation of mitigation measures." (*POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 735.) "However, this general rule against deferring the formulation of mitigation measures is not absolute. Courts have recognized that 'there are circumstances in which some aspects of mitigation may appropriately be deferred.'" (*Ibid*.) But in order to defer formulation of a mitigation measure, the agency must "commit itself to *specific performance criteria* for evaluating the efficacy of the measures implemented." (*Id.* at p. 738.)

Moreover, "[m]itigation measures must be fully enforceable through permit conditions, agreements, or other legally-binding instrument." (CEQA Guidelines, § 15126.4, subd. (a)(2).)

Mitigation measure 16.2 is simply an announcement that Kingsburg "intends" to initiate a study after which it will "consider" adopting an ordinance implementing unspecific changes to the city's traffic impact fees. As the language of the measure makes clear, Kingsburg could, after considering the issue, decide not to change the city's traffic impact fees at all. Mitigation measure 16.2 offers no enforceable standards by which to exert a mitigating effect on potential environmental impacts. (Cf. *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1122.) Nor does mitigation measure

16.2 provide specific performance criteria. (See *POET, LLC v. State Air Resources Bd.*, *supra*, 218 Cal.App.4th at p. 738.) Accordingly, it is not truly a mitigation measure at all.

However, we disagree with Selma's argument the MND should be invalidated as a result. The potential impact mitigation measure 16.2 was formulated to mitigate was the additional traffic loads that could be created by future development projects. Even without mitigation measure 16.2, the traffic impacts of future projects will be mitigated with project-specific measures under mitigation measure 16.1. Therefore, we reject Selma's contention the potential ineffectiveness of mitigation measure 16.2 warrants invalidation of the MND.

## VIII. Kingsburg Failed to Carry Its Burden in Showing the Commonsense Exemption Applied to the Repeal of Part VI of the NKSP

Kingsburg determined its repeal of part VI of the NKSP would "certainly" not cause any environmental impacts. Accordingly, it invoked the "commonsense exemption" to CEQA. (See CEQA Guidelines, § 15061, subd. (b)(3).) Selma challenges the applicability of that exemption.

### A. Law

A project may be found exempt from CEQA "under what is sometimes called the 'commonsense' exemption, which applies '[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment' [citation]. [Citation.]" (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380.) "The exemption can be relied on only if a factual evaluation of the agency's proposed activity reveals that it applies." (*Id.* at p. 386.) "If legitimate questions can be raised about whether the project might have a significant impact and there is any dispute about the possibility of such an impact, the agency cannot find with certainty that a project is exempt." (*Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 117.) "[I]f a reasonable argument is made to suggest a possibility that a project will cause a significant environmental impact, the agency must refute that

40.

claim *to a certainty* before finding that the exemption applies." (*Id.* at p. 118.) "[T]he agency invoking the exemption has the burden of demonstrating it applies. [Citation]." (*Muzzy Ranch Co.*, *supra*, at p. 386.) Under this strict standard, we conclude Kingsburg failed to carry its burden.

### B.     Analysis

Kingsburg defends its determination the commonsense exemption applies by observing that even after the repeal of part VI of the NKSP, future development projects would still have to comply with city zoning ordinances and codes, as well as statewide plans and standards. This argument does not go quite as far as Kingsburg needs it to. In order to invoke the exemption, Kingsburg needed "to be *certain* that there [was] *no possibility* [that repealing the NKSP design standards] may cause significant environmental impacts." (*Davidon v. City of San Jose*, *supra*, 54 Cal.App.4th at p. 117.) The mere existence of other standards does not preclude the possibility that repealing the design standards could still cause significant environmental impacts. For example, if the NKSP design standards offered substantially more environmental protection in one or more areas compared to existing codes and ordinances, then one could not be certain that repealing the design standards falls under the commonsense exemption. And it was Kingsburg's burden to refute that possibility "*to a certainty*" (*id.* at p. 118) before concluding the commonsense exemption applied. Kingsburg did not do so and thereby failed to carry its burden.

We also conclude Kingsburg's notice of exemption for repealing part VI of the NKSP was inadequate. An "'agency's exemption determination must [rely on] evidence in the record demonstrating that the agency considered possible environmental impacts in reaching its decision.' [Citation]." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.*, *supra*, 41 Cal.4th at pp. 386-387.) An agency errs when it fails to "reference the factual record in its Notice of Exemption." (*Id.* at p. 389.) Here, the notice of

exemption simply stated in conclusory fashion: "It can be seen with certainty that there is no potential for environmental impacts that may result from the proposed amendment as it is a repeal of text in an adopted Specific Plan." Accordingly, Kingsburg "erred in failing to reference the factual record in its Notice of Exemption." (*Muzzy Ranch Co.*, *supra*, at p. 389.)

Kingsburg's decision that repealing the design standards of the NKSP was exempt from CEQA under the commonsense exemption must be set aside. However, it is important to note we only find Kingsburg *failed to carry its burden* in showing the commonsense exemption applies. We do not conclude the commonsense exemption is definitely inapplicable. (See DISCUSSION, pt. IX, *post*.) Under these circumstances, Kingsburg may again invoke the exemption if, after proper consideration, it hereafter finds to a certainty there is no possibility significant environmental impacts may result from the project, *and that finding is supported in the record*. (*Davidon v. City of San Jose*, *supra*, 54 Cal.App.4th at p. 119.) "If it cannot make such a finding, it must proceed to the next tier of environmental review and conduct an initial study. (Guidelines, § 15063.)" (*Id.* at pp. 119-120.)

## IX. Selma Failed to Exhaust Its Administrative Remedies With Respect to Identifying Specific Potential Environmental Impacts of Repealing Part VI of the NKSP

Selma tries to go a step further, suggesting the repeal of the NKSP design standards certainly *does* present the possibility of significant environmental impacts. Specifically, Selma argues the NKSP design standards "enhance aesthetics by 'land use and circulation proposals' and 'design, development and maintenance standards.' It mitigates noise impacts by standards for placement of industrial structures, wall construction, 'buffer landscaping,' fencing and barriers."

Of course, if we conclude there was substantial evidence of possible significant environmental impacts, then Kingsburg would be precluded from invoking the

commonsense exemption on remand.  However, we reject Selma's contentions because it failed to raise these issues administratively.

**A.    Law**

A CEQA action may not be brought "unless the alleged grounds for noncompliance with [CEQA] were presented to the public agency orally or in writing by any person during the public comment period provided by [CEQA] or prior to the close of the public hearing on the project before the issuance of the notice of determination." (§ 21177, subd. (a).)  "'"The essence of the exhaustion doctrine is the public agency's opportunity to receive and respond to articulated factual issues and legal theories *before* its actions are subjected to judicial review."'  [Citation.]"  (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 623.)  "'The purposes of the doctrine are not satisfied if the objections are not sufficiently specific so as to allow the Agency the opportunity to evaluate and respond to them.'  [Citation.]"  (*Ibid.*)

**B.    Analysis**

Kingsburg published notice of a public hearing on the repeal of part VI of the NKSP.  The notice indicated:  "It has been determined that the action is exempt from the California Environmental Quality Act as it will not result in a physical change to the environment."  The notice also contained the following text:  "NOTICE:  If you challenge the decision on any of the forgoing [*sic*] matters in court, you may be limited to raising only those issues you or someone else raised at the public hearing described in this notice, or in written correspondence delivered to the Kingsburg Planning Department prior to the public hearing."  The notice was published in a newspaper of general circulation on May 22, 2013, and the hearing was held on June 5, 2013.  At the public hearing, no one mentioned the specific potential environmental impacts Selma now

43.

identifies (e.g., enhanced aesthetics, noise mitigation, etc.). Accordingly, those issues cannot be raised in this appeal. (See § 21177, subd. (a).)

Selma responds that since CEQA itself does not provide for a public comment period when an agency proceeds with a notice of exemption under CEQA Guidelines section 15061, subdivision (b)(3), the exhaustion statute may not apply. (See § 21177, subd. (a) [CEQA action precluded "unless … alleged grounds for noncompliance … were presented … during the public comment period provided by" CEQA].) Selma contends *Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281 suggests section 21177 "only comes into play when there has been a 'public comment period' provided under the provisions of CEQA." We disagree, as this is the opposite of what *Tomlinson*—and the statutory text—suggests.

*Tomlinson* began its exhaustion analysis—as we do now—by observing section 21177, subdivision (a) "states that a court action alleging a public agency's failure to comply with CEQA may be brought only if 'the alleged grounds for noncompliance with [CEQA] were presented to the public agency orally or in writing by any person during *the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination.*'" (*Tomlinson v. County of Alameda*, *supra*, 54 Cal.4th at p. 289.) The Supreme Court observed that, by its terms, subdivision (a) of section 21177 "requires *either* (1) a public comment period provided by CEQA (the public comment provision) *or* (2) an opportunity for public comment at public hearings before issuance of a notice of determination (the public hearing provision)." (*Tomlinson*, at p. 289, italics added.) Thus, while the public *comment* provision was inapplicable to categorical exemption cases because CEQA does not provide for a public comment period in those circumstances, the public *hearing* provision may still apply. (*Tomlinson*, at pp. 289-290.) Accordingly, *Tomlinson* held "the exhaustion-of-administrative-remedies requirement set forth in subdivision (a) of section 21177 applies to a public agency's decision that a proposed project is

44.

categorically exempt from CEQA compliance as long as the public agency gives notice of the ground for its exemption determination, and that determination is preceded by public hearings at which members of the public had the opportunity to raise any concerns or objections to the proposed project. [Citation.]" (*Id.* at p. 291.) Thus, Selma's contention *Tomlinson* suggests section 21177 *only* comes into play when there has been a "public comment period" provided under the provisions of CEQA is clearly wrong. Section 21177 also applies when there has been a properly noticed public hearing.

It was Selma's burden to demonstrate it raised these specific issues at the administrative level. (See *Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 527.) Because Selma failed to carry that burden, we reject its contentions concerning specific potential environmental impacts that might result from repealing the NKSP's design standards.

## DISPOSITION

The judgment in the Annexation action (i.e., case No. 12CECG03223) is affirmed.

The judgment in the NKSP action (i.e., case No. 13CECG02139) is reversed. The trial court is directed to issue a writ of mandate directing the City of Kingsburg to set aside its determination that its repeal of part VI of the North Kingsburg Specific Plan is exempt from CEQA review under the commonsense exemption.

Each party shall bear its own costs on appeal.

_____
PEÑA, J.

WE CONCUR:


_____
KANE, Acting P.J.


_____
DETJEN, J.

45.